J-A26032-20

2020 PA Super 255

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
BRANDON EUGENE DAVIS :
:
Appellant : No. 3193 EDA 2019

Appeal from the Judgment of Sentence Entered May 23, 2019
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0000830-2018

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED OCTOBER 23, 2020**

Appellant, Brandon Eugene Davis, appeals from the judgment of

sentence entered in the Court of Common Pleas of Bucks County following his

conviction by a jury on, *inter alia*, robbery, burglary, and conspiracy.[1] After a

careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Specifically, Appellant was convicted of five counts of robbery, 18 Pa.C.S.A.
§ 3701(a)(1)(ii), five counts of robbery, 18 Pa.C.S.A. § 3701(a)(1)(iii),
burglary, 18 Pa.C.S.A. § 3502, two counts of conspiracy, 18 Pa.C.S.A. § 903,
five counts of simple assault, 18 Pa.C.S.A. § 2701, five counts of recklessly
endangering another person, 18 Pa.C.S.A. § 2705, false imprisonment of a
minor, 18 Pa.C.S.A. § 2903(b), four counts of false imprisonment, 18
Pa.C.S.A. § 2903(a), unlawful restraint of a minor, 18 Pa.C.S.A. § 2902(b),
four counts of unlawful restraint, 18 Pa.C.S.A. § 2902(a), theft by unlawful
taking, 18 Pa.C.S.A. § 3921, theft by extortion, 18 Pa.C.S.A. § 3923, and
criminal coercion, 18 Pa.C.S.A. § 2906.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with an armed home invasion occurring on August 21, 2017, at the home of Jonathan and Emily Nadav in Newtown Township, Bucks County.[2] On October 11, 2018, Appellant filed a counseled omnibus pre-trial motion seeking to suppress the police's seizure of cell phone records, specifically the historical cell-site location records for Appellant's cell phone.[3] **See** Appellant's Suppression Motion, filed 10/11/18, at 1-2.

Appellant admitted the Commonwealth obtained a court order requiring Appellant's cell phone wireless provider, T-Mobile/Metro PCS, to disclose and furnish the police with the cell-site location records. ***See id.*** However, Appellant contended the police's acquisition of his cell-site location records constituted a search for which a warrant supported by probable cause was required. ***See id.*** Accordingly, absent a warrant, Appellant averred the cell-

---

[2] Appellant's co-conspirators, Sadeen Jones and Raymond Anthony Daniels, were also arrested in connection with the home invasion. Jones proceeded to a jury trial with Appellant, and he was convicted of numerous crimes, including robbery, burglary, and conspiracy. He received an aggregate sentence of 70 years to 140 years in prison. Jones filed a direct appeal from his judgment of sentence, and the appeal has been docketed in this Court at 3284 EDA 2019. Jones' appeal shall be addressed in a separate decision. Daniels pled guilty to, *inter alia*, robbery, burglary, and conspiracy. He received an aggregate sentence of 40 years to 80 years in prison, and on direct appeal, this Court affirmed his judgment of sentence. ***See Commonwealth v. Daniels***, No. 1618 EDA 2019 (Pa.Super. filed 4/7/20) (unpublished memorandum).

[3] Appellant also presented notice of an alibi defense in his omnibus pre-trial motion.

site location records were improperly seized by the police and, thus, required exclusion under the Fourth Amendment of the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution. *See id.*

On November 5, 2018, the Commonwealth filed a motion in opposition to Appellant's omnibus pre-trial suppression motion. Therein, the Commonwealth admitted that, on November 3, 2017, the Commonwealth secured a court order directing the wireless carrier to provide the requested cell phone records, including the historical cell-site location records for Appellant's cellular telephone, from August 1, 2017, to October 31, 2017.[4] Commonwealth's Motion In Opposition, filed 11/5/18, at 1-2. The Commonwealth averred it sought this order on the basis there were "reasonable grounds to believe that the requested records were relevant and material to the on-going burglary investigation." *Id.* (internal quotations omitted).

The Commonwealth acknowledged that prior to Appellant's jury trial the U.S. Supreme Court issued an opinion on June 22, 2018, in *Carpenter v. United States*, ___ U.S. ___, 138 S.Ct. 2206 (2018), in which the High Court

---

[4] We note that a Bucks County Assistant District Attorney filed a petition in support of the request for disclosure of the cell phone records pursuant to Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5743, and the federal Stored Communications Act, 18 U.S.C. § 2703(d). In support thereof, the assistant district attorney attached an affidavit, which was completed by Newtown Township Police Detective Chris Bush.

held that the police's seizure of historical cell-site location records from wireless carriers constitutes a search for which a warrant supported by probable cause is generally required. Commonwealth's Motion In Opposition, filed 11/5/18, at 2. Accordingly, in the wake of **Carpenter**, on July 5, 2018, the police secured a search warrant for the historical cell-site location records with regard to Appellant's cell phone.[5] **Id.**

The Commonwealth averred the warrant was supported by probable cause, and the warrant was served upon T-Mobile/Metro PC, which released to the police the same cell phone records which the Commonwealth previously secured via the court order. **Id.** The Commonwealth argued the seizure of the cell phone records via the execution of the search warrant purged the taint of any original illegality. **Id.** at 11. The Commonwealth reasoned that since the cell phone records would have been (and in fact were) ultimately discovered by lawful means the evidence should not be excluded pursuant to the inevitable discovery doctrine. **Id.** at 11-12.

On November 7, 2018, and December 19, 2018, the trial court held hearings on Appellant's suppression motion. Initially, Appellant's counsel requested permission to amend the suppression motion to include the argument that the search warrant secured by the Commonwealth after

---

[5] Specifically, on July 3, 2018, Detective Bush completed an application for a search warrant for the disclosure of records for cell phone number (***)***-4478, which was determined to be Appellant's cell phone number. Detective Bush attached to the application his affidavit of probable cause.

*Carpenter* was not supported by probable cause, and thus, the cell phone records were fruits of the poisonous tree. N.T., 11/7/18, 6. The assistant district attorney did not object to the amendment, and accordingly, the trial court permitted Appellant to amend his suppression motion. *Id.*

At the hearing, the defense offered no witnesses while the Commonwealth offered the testimony of Newtown Township Police Detective Chris Bush.[6] Detective Bush relevantly testified he prepared the affidavit for the police to secure the records for Appellant's cellular telephone via a court order, and a trial court judge signed the order. *Id.* at 36-37. As a result, the police received Appellant's cell phone records, including the historical cell-site location records. *Id.* at 37.

Thereafter, the Commonwealth contacted Detective Bush and asked him to secure a search warrant for Appellant's cell phone records. *Id.* Accordingly, Detective Bush prepared an application and affidavit of probable cause for a search warrant. *Id.* at 38-39. Detective Bush served the search warrant upon the wireless carrier, which provided the detective with the exact same records that the carrier had provided in response to the previous court order. *Id.* at 39, 47-48.

---

[6] The Commonwealth also offered the testimony of Detective Daniel Bartle; however, Detective Bartle's testimony was limited to an explanation of the order and search warrant with regard to Daniels' cell phone records.

On cross-examination, Detective Bush clarified the Commonwealth received the court order for Appellant's cell phone records on November 3, 2017, and he received the search warrant on July 5, 2018. *Id.* at 68.

On re-direct examination, Detective Bush testified his affidavit for the court order for Appellant's cell phone records and his affidavit of probable cause for the search warrant contained the same information with one exception. *Id.* at 73. Specifically, he removed from the affidavit of probable cause language pertaining to the police's reviewing of Daniels' and Jones' cell phone records, which revealed that, at the time of the home invasion, cell device activities were captured on cell phone towers near the Nadav home.[7] *Id.*at 73-74. Detective Bush explained that when he obtained the court order for Appellant's cell phone records the law did not require a search warrant; however, after the law changed, the Commonwealth asked him to secure a search warrant. *Id.* at 75.

At the conclusion of the hearing, Appellant's counsel argued that after the police seized Appellant's cell phone records via a court order the

_____

[7] Specifically, the following language was included in the affidavit for the court order, but was omitted from the affidavit of probable cause for the search warrant:

> Daniels' cell device activities were captured on cell phone towers in the vicinity of [the Nadav home]….Jones' cell device activities were captured on cell phone towers in the vicinity of [the Nadav home].

Exhibit CS-5, Order for disclosure of cell phone records, affidavit, filed 11/3/17.

Commonwealth's subsequent seizure of those same records via a search warrant did not comply with the U.S. Supreme Court's mandate under *Carpenter*. *Id.* at 88-89.

Appellant's counsel also argued that neither the affidavit for the court order nor the affidavit for the search warrant set forth sufficient grounds for probable cause. *Id.* at 89. Appellant's counsel admitted the affidavits referenced in detail the events occurring at the Nadav residence, as well as the evidence identifying Appellant's co-conspirators. *Id.* at 90. However, Appellant's counsel averred that, as to Appellant's connection to the case, the affidavits only referenced a cell phone number, later linked to Appellant, as having contact with a co-conspirator from 2:00 a.m. to 2:30 a.m. during the home invasion. *Id.* at 89-90. Counsel noted that, while both affidavits set forth Appellant's cell phone number, the documents did not mention Appellant by name or identify him in any other manner. *Id.* at 90.

At the conclusion of the hearing, by order entered on January 14, 2019, the suppression court denied Appellant's motion to suppress the cell phone records, including the historical cell-site location records for Appellant's cell phone. Specifically, the suppression court indicated the following:

> 10. On November 3, 2017, Court Order No. MD-3215-2017 was signed by the Honorable Wallace H. Bateman, Jr. of the Bucks County Court of Common Pleas for all certified account phone

records[8] of (\*\*\*)\*\*\*-4478 for the time period between August 1, 2017, through [October] 3[1], 2017.

11. On July 5, 2018, Search Warrant #CA52-6343 was issued [by] the Honorable Wallace H. Bateman, Jr. of the Bucks County Court of Common Pleas for the seizure of all certified account phone records of (\*\*\*)\*\*\*-4478.

12. The Affidavits in support of both the Court Order and the Search Warrant for cell phone number (\*\*\*)\*\*\*-4478 are nearly identical.

13. Detective Chris Bush, a sworn Newtown Township Police Department Detective, executed Search Warrant #AA52-6343 and obtained all certified account phone records of (\*\*\*)\*\*\*-4478.

14. When Detectives Bartle and Bush sought the aforesaid Court Orders for the cell-site data, Pennsylvania law, [18 Pa.C.S.A. § 57434(d)], required the application to be supported by specific and articulable facts showing reasonable grounds to believe contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

15. On June 22, 2018, the Supreme Court of the United States issued *Carpenter v. United States*, 138 S.Ct. 2206 (2018), holding the Government must generally obtain a search warrant supported by probable cause before acquiring cell-site data.

16. *Carpenter v. United States*, 138 S.Ct. 2206 (2018) was decided after the…aforementioned Court Order[] [was] signed.

**CONCLUSIONS OF LAW FOR DEFENDANT['S] MOTION TO SUPPRESS CELL PHONE RECORDS INCLUDING HISTORICAL CELL-[S]ITE DATA**

1. Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that the items sought will be located in the area to be searched.

2. [The] Court Order[] [was] sought in compliance with the law, as it existed at the time.

---

[8] The suppression court indicated that "certified account phone records" includes "cell-site data." Suppression Court Order, filed 1/17/19, at 2.

\*\*\*

5. Court Order No. MD-3215-2017 to seize the aforementioned information from cell phone number (\*\*\*)\*\*\*-4478 was supported by probable cause.

6. The subsequent issuance and execution of the aforesaid Search Warrants cured any defects with the aforesaid Court Orders, in light of **Carpenter v. United States**, 138 S.Ct. 2206 (2018).

7. The issuance of the…aforesaid Search Warrant[] [was] not tainted by illegality and was not fruit of the poisonous tree.

8. The actions of law enforcement associated with the…aforesaid Search Warrant[] were legal and proper in all respects.

Suppression Court Order, filed 1/17/19, at 3-4 (bold in original) (footnote omitted) (footnote added).

Thereafter, the matter proceeded to a jury trial at which Appellant was represented by counsel. At trial, the Commonwealth established that, during the evening of August 17, 2018, Appellant and several co-conspirators conducted surveillance of the Nadavs' home, and at 2:00 a.m. on August 21, 2017, they entered the home carrying firearms, as well as wearing masks, gloves, and dark clothing. **See** Trial Court Opinion, filed 2/5/20, at 4-5.

Twenty-five-year-old Elle Nadav and her twelve-year-old sister, C.N., were in the home, along with their maternal grandmother, Manya Guravich, and their parents, Jonathan and Emily Nadav. **Id.** Their sister, Jade, was away at college. **Id.** at 5.

After the men entered the home through a window, two of them approached Elle, woke her, pointed guns at her, and bound her hands with shoelaces. **Id.** After she was restrained, one of the gunmen used his cellular

telephone to advise someone, "We're in." *Id.* (quoting N.T., 1/28/19, at 48). The men told Elle they were there for "Yanni," which is the nickname of her father, Jonathan. *Id.* at 4. One of the gunmen remained with Elle and took her wallet and cell phone. *Id.* at 5. Meanwhile, a different gunman woke Manya and took her watch. *Id.* A third gunman woke C.N., forced her into her parents' room, and forced her to wake them. *Id.* at 6. Thus, the Nadavs awoke to find their twelve-year-old daughter being held at gunpoint. *Id.*

The gunmen demanded the Nadavs open their safe, and Jonathan, who owns several clothing stores in the Philadelphia area, initially denied there was a safe. *Id.* In response, a gunman slapped him hard across the face and then used his cellular telephone to advise someone, "I need help here." *Id.* (quoting N.T., 1/28/19, at 103).

Jonathan then opened the safe at gunpoint. *Id.* The gunmen removed jewelry and $50,000.00 from the safe; in total, they stole more than $300,000.00 in property and cash from the Nadav house. *Id.* at 7. Jonathan, Emily, C.N., and Manya were forced into a closet and warned not to call the police. *Id.* Before leaving, the gunmen told Elle they knew where Jade went to college and described Jade's car. *Id.* at 5. They told Elle that Jade would be killed if the family called the police. *Id.* However, after the gunmen left, Emily called the police, who were dispatched at 2:32 a.m. *Id.* at 7.

With regard to the evidence, including the historical cell-site location evidence, linking Appellant to the home invasion, the trial court accurately summarized the evidence offered at trial as follows:

> The evidence…established that, at the time of the events on trial, all three [co-conspirators] resided in Philadelphia. Information regarding telephone numbers, message content, photographs[,] and contact information extracted from all three cellular telephones established that the [co-conspirators] were using those cellular telephones at the time of the events on trial. [Co-conspirator Jones] was the individual who used the cellular telephone identified at trial as the "Jones phone." [Appellant] was the individual who used the cellular telephone identified at trial as the "Davis phone." [Co-conspirator] Daniels was the individual who used the cellular telephone identified at trial as the "Daniels phone." The [co-conspirators] were also connected to those cellular telephones through historical cell-site location information.
>
> Analysis of the call detail records and the historical cell-site location information obtained from the wireless service providers for those cellular telephones established that, just days before the home invasion, all three [co-conspirators] traveled from North Philadelphia to the victims' residence, where they remained for at least thirty minutes before returning to North Philadelphia. Specifically, the records established that, shortly before midnight on August 14, 2017[,] all three cellular telephones accessed cell towers located in North Philadelphia. At midnight on August 15, 2017, all three cellular telephones accessed the cell tower located closest to the victims' residence. That cell tower was located less than a third of a mile from the victims' residence and is visible from that location. The cellular telephones continued to be used in the vicinity of the victims' residence for at least thirty minutes. By 1:20 a.m., all three cellular telephones were accessing a cell tower in North Philadelphia.
>
> Analysis of the cell detail records and the historical cell-site location information also placed the three [co-conspirators] at the crime scene at the time of the home invasion. Specifically, the records established that, shortly before midnight on August 20, 2017, all three cellular telephones accessed a cell tower located in North Philadelphia. At 1:59 a.m. on August 21, 2017, a call was placed from [Appellant's] cellular telephone to Jones' cellular

telephone. The connection lasted for fifteen minutes and fifty-eight seconds. A second call was placed from [Appellant's] cellular telephone to Jones' cellular telephone at 2:15 a.m., approximately one minute after the first call terminated. The connection lasted for twelve minutes and fifty-one seconds. Both calls were processed through the cell tower located in the victims' neighborhood. Between 1:59 a.m. and 2:29 a.m., all three cellular telephones were utilized to communicate with each other, each call again accessing [the cell tower] located less than a third of a mile from the victims' residence. GPS location data extracted from [Appellant's] cellular telephone place that cellular telephone [by the Nadavs' residence] at 12:05:40 a.m. By 2:54 a.m., all three cellular telephones were accessing a cell tower in North Philadelphia.

At 2:54:49 a.m. that same date, the following text was sent from [Appellant's] cell [*sic*] cellular telephone, "Nah, I'm with Juice. We just came back from Yoni crib. Give me a second. We driving now." N.T., 1/28/19, at 201[.] Cellular telephone text message content and other evidence established that Jones goes by the name "Juice."

Real time cellular telephone location data (pinging) was utilized in an attempt to locate the cellular telephone stolen during the home invasion. The last location data available indicated that the telephone was in the vicinity of [****] Tacony Street in Philadelphia. That address is located adjacent to Interstate 95, between the crime scene and the residences of [Jones] and [Appellant]. Investigators searched the area but were unable to recover the cellular telephone.

At approximately 3:30 a.m., [which was] approximately an hour after the home invasion, Daniels showed his girlfriend, Marlon Burton, the wallet and credit cards that were taken from the Nadav residence. Shortly thereafter, Daniels and Burton made purchases at five separate locations utilizing those credit cards. Historical cell-site location information confirmed that Daniels and Burton traveled to the five locations where the credit cards were used. A blank check that was found in the wallet was made payable to Burton in the amount of $5,500 and was later deposited into Burton's account.

Call detail records also established that shortly after 5[:00] a.m. on August 21, 2017, within hours of the home invasion, [the co-conspirators, including Appellant,] exchanged text messages reveling in the value of the property they were able to obtain

during the home invasion, referring to a Rolex watch, a firearm, Euro currency, a Chanel bag, and a Louis Vuitton bag. Jones started the exchange when he text messaged [Appellant] and Daniels, "Yo, Boy! You still up???" and accompanied the text with a money bag emoji and a flexing bicep emoji. During one text message exchange, [Appellant] advised Jones, "We deserve this shit, Juice. We been through too much." N.T., 1/28/19, at 223. [Appellant] later sent a text message stating, "I'm selling this Rollie." N.T., 1/28/19, at 201.

Information extracted from [Appellant's] cellular telephone and Daniels' cellular telephone established that twenty calls were made between the two cellular telephones on August 20, 2017[,] through August 21, 2017.

On August 24, 2017, police recovered a cellular telephone from Jones and $3,579….A photograph of a handgun extracted from [Appellant's] cellular telephone was identified as the handgun that was taken from the victims' residence. Jones' DNA was taken and compared to DNA found on a partially smoked cigar in a pack of cigarettes found on the street outside the crime scene. Jones' DNA matched the DNA found on the cigar.

A search warrant was executed at Daniels' residence….During that search[,] police recovered Louis Vuitton luggage belonging to the Nadavs and a 9-millimeter firearm.

In November of 2017, Daniels sent a text message to [Appellant] advising him that, "They got your number. They just don't know who you are." Daniels further advised [Appellant], "That's the only way they can get you and Juice…" During this exchange, Daniels instructed [Appellant] how to change his cell [*sic*] cellular telephone number using an "app." [Appellant] advised Daniels, "I'm trying to change it now."

Trial Court Opinion, filed 2/5/20, at 7-11 (citations to record and footnotes omitted).

At the conclusion of trial, Appellant was convicted of the offenses indicated *supra*, and on May 23, 2019, Appellant proceeded to a sentencing hearing, at the conclusion of which the trial court sentenced Appellant as follows: Count 1, robbery (as to Jonathan Nadav), ten years to twenty years

in prison; Count 35, robbery (as to Emily Nadav), ten years to twenty years in prison, to run concurrently to Count 1; Count 36, robbery (as to twelve-year-old C.N.), ten years to twenty years in prison, to run consecutively to Count 1; Count 37, robbery (as to Elle Nadav), ten years to twenty years in prison, to run consecutively to Count 1; Count 38, robbery (as to Manya Guravich), to run consecutively to Count 1; Count 2, conspiracy to commit robbery, ten years to twenty years in prison, to run concurrently to the other sentences; Count 10, burglary, ten years to twenty years in prison, to run concurrently to the other sentences; Count 16, false imprisonment of a minor, five years to ten years in prison, to run concurrently to the other sentences; and Counts 25, 45, 46, 47, false imprisonment of adults, one year to two years on each count to run concurrently to all other sentences. N.T., 5/23/19, at 67-69. The trial court imposed no further penalty on the remaining counts. *Id.* at 69. Appellant received an aggregate of forty years to eighty years in prison.

On May 28, 2019, Appellant filed a timely, counseled post-sentence motion in which he sought the reconsideration of his sentence, as well as permission to file a supplemental post-sentence motion upon receipt of the necessary transcripts. By order entered on June 27, 2019, the trial court indicated Appellant would have until July 29, 2019, to file all supplemental post-sentence motions.

On July 26, 2019, Appellant filed a counseled, supplemental post-sentence motion averring the suppression court erred in denying his motion to suppress the historical cell-site location records for his cell phone, and he challenged the sufficiency of the evidence supporting his convictions. On September 9, 2019, the Commonwealth filed an answer in opposition to Appellant's post-sentence motions. By order entered on September 17, 2019, the trial court entered an order indicating that, for good cause shown, "the 120 day consideration period pursuant to Pa.R.Crim.P. Rule 720 is hereby extended 30 days."[9]  Trial Court Order, filed 9/17/1.  *See* Pa.R.Crim.P. 720(B)(3)(b) ("Upon motion of the defendant within the 120-day dispositional period, for good cause shown, the judge may grant one 30-day extension for decision on the motion.").

By order entered on October 21, 2019, prior to the expiration of the extended disposition period, the trial court denied Appellant's post-sentence motion, and on November 4, 2019, this timely counseled appeal followed.  All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Presented" (verbatim):

> A.      Whether the trial court erred in admitting cell phone data and site location data, when the search and seizure of Appellant's

---

[9] On October 4, 2019, Appellant filed a counseled notice of appeal prior to the trial court's order denying his post-sentence motion; however, Appellant subsequently filed a motion to discontinue the appeal, and on October 21, 2019, this Court marked the appeal "discontinued."

cell phone was conducted without a search warrant and the subsequently issued search warrant failed to state probable cause?

B.    Whether the trial court's sentence of forty (40) to eight [*sic*] (80) years was manifestly unreasonable and excessive and amounted to an abuse of discretion?

Appellant's Brief at 5 (suggested answers omitted).

In his first issue, Appellant contends the trial court erred in denying his motion to suppress the evidence of his historical cell-site location information since the evidence was unlawfully obtained without a search warrant in violation of the U.S. Supreme Court's decision in **Carpenter**, **supra**.[10]  The **Carpenter** Court held that law enforcement must first obtain a search warrant supported by probable cause in order to obtain historical cell-site location information from wireless service providers, absent a specific exception to the warrant requirement.  **Carpenter**, 138 S.Ct. at 2216 (applying Fourth Amendment to a "new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals").[11]

_____

[10] Although Appellant's "Statement of Questions Presented" broadly refers to the suppression of "cell phone data and site location data," Appellant's argument section is focused on suppression of his cell phone's historical cell-site location data.  Accordingly, we shall so limit our analysis.

[11] The Supreme Court emphasized that its decision was "narrow" and indicated that it was not expressing a view on real-time cell-site location information or "tower dumps" ("a download of information on all the devices that connected to a particular cell site during a particular interval").  **Id.** at 2220. The Court added that its decision was not calling into question "conventional surveillance

Consequently, according to Appellant, suppression of his historical cell-site location records was necessary under the U.S. and Pennsylvania Constitutions since (1) law enforcement initially obtained the cell-site location evidence on November 3, 2017, pursuant to the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5743, and the Stored Communications Act, 18 U.S.C.A. § 2703, which permit a government entity to obtain disclosure of the records of a wireless service provider based on a showing that there are specific and articulable facts that demonstrate reasonable grounds for believing that the records are material to an ongoing investigation, which is a lesser standard than the probable cause standard mandated by *Carpenter*, and, thus, the court order issued in the first instance was not a constitutionally valid substitute for a proper search warrant; (2) despite the fact the police later obtained a search warrant for the historical cell-site location records, the evidence must be excluded since the search warrant did not purge the taint of illegality from the prior seizure of the records; and (3) in any event, the police's affidavit of probable cause for the search warrant did not set forth the necessary probable cause.

In reviewing Appellant's suppression claim, we are mindful that:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the

techniques and tools, such as security cameras…or business records that might incidentally reveal location information." *Id.*

legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 639 Pa. 100, 159 A.3d 503, 516 (2017) (citations omitted).

In the case *sub judice*, there is no dispute the police initially seized the cell-site location information for Appellant's cell phone via a court order in conformity with the law as it existed on November 3, 2017. However, on June 22, 2018, prior to Appellant's jury trial, the U.S. Supreme Court filed *Carpenter*. Consequently, on July 3, 2018, the police filed an application for a search warrant to seize the same historical cell-site location records in order to conform with the Supreme Court's mandate in *Carpenter*.[12]

With these facts in mind, as to Appellant's first specific sub-issue, the Commonwealth "does not argue that the court order issued in the instant case was a constitutionally valid substitute for a search warrant." Commonwealth's Brief at 23. In fact, the Commonwealth acknowledges the trial court issued the court order for Appellant's cell phone records upon consideration of the

---

[12] We shall assume, *arguendo*, that *Carpenter* is applicable to this case since Appellant's criminal matter was pending in the trial court when the U.S. Supreme Court filed the opinion.

less burdensome "reasonable grounds" standard. *Id.* Accordingly, the Commonwealth does not dispute that the initial acquisition of the cell-site location records was unlawful in the wake of *Carpenter*.

However, contrary to Appellant's second specific sub-issue, the Commonwealth contends its seizure of the historical cell-site location records pursuant to the post-*Carpenter* search warrant purged any taint of illegality resulting from the initial seizure such that there is no need for exclusion of the evidence. In this vein, the Commonwealth contends the cell-site location records are admissible under the inevitable discovery doctrine.

Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible." *Commonwealth v. Gatlos*, 76 A.3d 44, 60 n.13 (Pa.Super. 2013) (citation omitted).

In *Commonwealth v. Berkheimer*, 57 A.3d 171 (Pa.Super. 2012) (*en banc*), this Court reviewed the development of the inevitable discovery doctrine and explained that Pennsylvania courts have interpreted the doctrine more narrowly based on the understanding that the exclusionary rule serves an essential role in safeguarding the right to privacy under Article I, Section 8. *Id.* at 181-88. This Court explained that in cases where evidence is gathered through "a substantially unwitting violation of the warrant requirement, devoid of any cognizable misconduct," the inevitable discovery

doctrine in Pennsylvania is coterminous with its application under the Fourth Amendment. *Id.* at 188. This standard requires a finding that the law enforcement officer's decision to seek a warrant was prompted by information independent of what was learned during the unlawful search and the information illegally obtained did not influence the issuing authority's decision to issue the search warrant. *Id.* at 184.

In the case *sub judice*, the parties do not dispute that the police did not commit any "cognizable misconduct" when they initially seized the cell-site location records in November of 2017 via a court order. *See Berkheimer*, *supra*. Further, when the United States Supreme Court ruled that such seizures required a valid search warrant, the police secured the same records with a search warrant.

Moreover, in the affidavit of probable cause for the warrant, the police did not utilize any information that they had uncovered as a result of their initial seizure of Appellant's cell phone records. *See id.* In fact, the affidavits for the order and search warrant are nearly identical, and there is no evidence information illegally obtained influenced the issuance of the search warrant.[13] *Id.*

---

[13] As indicated *supra*, although Detective Bush included in his affidavit for the court order information pertaining to Daniels' and Jones' cell-site locations during the home invasion, he did not include this information in the affidavit of probable cause for the search warrant. In all other respects, the affidavits are nearly identical.

Furthermore, Detective Bush testified he initially seized Appellant's cell phone records via a court order because that was the law in effect in Pennsylvania at the time; however, when the law changed, he secured the records via a search warrant. N.T., 11/7/18, at 75.

Stated simply, the Commonwealth demonstrated by a preponderance of the evidence that the police committed "a substantially unwitting violation of the warrant requirement, devoid of any cognizable misconduct" when the evidence was initially seized, and the evidence would have been ultimately discovered by lawful means. ***Berkheimer***, 57 A.3d at 188. Therefore, the evidence was sufficiently purged of any original illegality to allow its admission under the inevitable discovery doctrine. ***Commonwealth v. Gonzalez***, 979 A.2d 879, 890 (Pa.Super. 2009) (holding this doctrine requires that the evidence at issue would have been discovered inevitably despite the initial illegality).

Next, we address Appellant's third sub-issue in which Appellant contends the instant search warrant was not supported by probable cause.

> "The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause." ***Commonwealth v. Edmunds***, 526 Pa. 374, 586 A.2d 887, 899 (1991) (quoting ***Commonwealth v. Miller***, 513 Pa. 118, 518 A.2d 1187, 1191 (1986)). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." ***Commonwealth v. Thomas***, 448 Pa. 42, 292 A.2d 352, 357 (1972).

In **_Illinois v. Gates_**, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In **_Commonwealth v. Gray_**, 509 Pa. 476, 503 A.2d 921 (1986), [the Pennsylvania Supreme] Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, [our Supreme Court] stated:

> Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in **_Gates_**, the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place....It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the [issuing authority] had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

> * * *

> [Further,] a reviewing court [is] not to conduct a _de novo_ review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

**_Commonwealth v. Torres_**_,_ 564 Pa. 86, 764 A.2d 532, 537–38, 540 (2001).

As our United States Supreme Court stated: "A grudging or negative attitude by reviewing courts towards warrants…is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." **_Gates_**, **_supra_** at 236, 103 S.Ct. 2317 (citation and quotation marks omitted); **_see also_**

> ***United States v. Leon***, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to [an issuing authority's] determination.").

***Commonwealth v. Jones***, 605 Pa. 188, 988 A.2d 649, 655-56 (2010)

(footnote omitted).

In the case *sub judice*, the affidavit of probable cause for the search warrant set forth, in relevant part, the following:

> Your Affiant, Detective Chris Bush #23, is a member of the Newtown Township Police Department…and has been assigned to the Detective Bureau since 1996 investigating violations of the Pennsylvania Crimes Code.
>
> On Monday, August 21, 2017 at 0239 hours, the Newtown Township Police Department received a 911 report of an armed Robbery at the address of # Wellington Road, Newtown Township, Bucks County, Pennsylvania 18940.
>
> Newtown Police Officers arrived on scene at 0237 hours and met with the Nadav family, confirming the Robbery and initiating the investigation.
>
> Jonathan Nadav informed the Police that while sleeping next to his wife, they were awakened to a commotion at the door of his master bedroom, where a black male, 6'1'', wearing a mask and dark hoodie was holding his daughter (12) at gun point. The actor demanded jewelry, cash and the location of his safe. Nadav said he told the actor to take his wallet and his wife's diamond earrings from the night tables. Nadav said that he resisted providing the safe's location to the actor and as a result the actor checked the walk in closet and located the safe. Nadav said he observed the actor remove the contents of the safe including; a .308 Walther handgun, his wife's gold jewelry, and approximately $48,000.00 in US currency. Nadav said the family was forced into the closet where they remained until after the actors left.
>
> Elle Nadav (25) who was sleeping in the basement at the time of the Robbery was interviewed and said she awoke to two black males wearing masks and hoodies with handguns standing

next to her. The actors told her to shut up and that her father owed them money. Elle said that one of the actors remained with her as the other actor left the basement and traveled upstairs. Elle said that before the second actor left the basement, he threatened harm and took her cell phone.

The Nadav family related to the Police that they observed the three actors use their cell devices to communicate and update each during the commission of the Robbery.

The Nadav family provided the Police with a stolen property report and documents/photographs and serial numbers of the stolen property, all of which totaled more than $200,000.

Nadav informed your Affiant that he is the owner of Official Unlimited, an urban clothing and footwear outlet located in Philadelphia, Pennsylvania. Nadav said he doesn't know of anyone that he owes money to that would have committed the Robbery.

On Monday, August 21, 2017, Nadav informed me that he received cell phone alerts from his Bank of America credit card company of suspicious activity, which he confirmed as fraudulent. The account activity revealed that after the robbery, between 0500-0700 hours, card #3841 was used at three retail outlets located in the Philadelphia area for the purchase of gift cards valued at several thousand dollars.

Your Affiant contacted Walmart and CVS Pharmacies where Nadav's credit card ending in #3841 was used and collected store receipts and surveillance video concerning the transactions. Your Affiant noticed that a black female, thin build, 25-35 years of age and tattoos, was involved with all the transactions. Nadav said he didn't recognize the female captured on video using his credit card.

On Monday, August 21st, Nadav said TD Bank had informed him that his checking account was overdrawn from a fund withdrawal on this date. Nadav said that a blank check taken during the Robbery was cashed for $5500.00, at an unknown bank branch. Upon your Affiant's review of the check copy (254), it was noted the check was made out to Marlon Burton.

Your Affiant conducted a Pennsylvania Driver's License search for Marlon Burton, which produced the following result: Driver's License ending in 146, Marlon Jermaiha Burton, B/F, 6' 1'', D.O.B. */*/1989, ***Grant Street, Philadelphia[.] Burton's driver's license photos are consistent with the female suspect captured on the CVS and Walmart store surveillance.

On Friday, September 22, 2017, your Affiant spoke with Santander Fraud Investigator, Stefanne Yingling, who confirmed that on August 21st, Nadav's TD Bank check (254) was deposited into a Santander checking account ending in 5950 at an ATM located at East Olney Avenue, Philadelphia[.] The Santander Bank account ending in 5950 was established by Marlon Burton…in January 2017. Your Affiant was provided the ATM surveillance of the check transaction and noticed the female suspect involved with the check transaction matches the physical description and clothing description [of] the suspect using Nadav's credit card for purchases at CVS and Walmart.

On October 4, 2017, Marlon J. Burton was taken into custody by the Philadelphia Police Department pursuant to the Newtown Township arrest warrant in connection to the Access Device Fraud. Marlon Burton's description was consistent with the suspect transacting Nadav's credit card on August 21, 2017.

Marlon Burton cooperated with the investigation and named Raymond Daniels as the person who, during the early morning hours of August 21st, arrived at her residence with Nadav's credit card. Burton said that she and Daniels traveled to retail outlets, and together they used Nadav's credit card for merchandise purchases including Vanilla Visa cards.

Marlon Burton identified Raymond Daniels from his INSTAGRAM Account photo and provided Daniels' cell number as (***)***-4717.

Your Affiant conducted a Pennsylvania Driver's License search and confirmed Raymond Anthony Daniels B/M with PA License ending in 054, Address, ## N. Garnet Street, Philadelphia[.] Raymond Anthony Daniels has arrests and convictions for numerous offenses including Robbery.

On October 19, 2017, your Affiant received and reviewed Raymond Daniels' AT&T Mobility cell phone records (***)***-4717 and noted that on the morning of the Robbery, August 21, 2017, between 0216-0234 hours, at the time of the robbery, there were cell exchanges with (***)***-3735.

Your Affiant queried Facebook and Law Enforcement Network Services and discovered the name associated with cell phone number (***)***-3735 is Sadeen Jones AKA Jamal Jones.

Your Affiant conducted a Pennsylvania Driver's License search and confirmed Sadeen Jones, B/M with PA ending in 1825, Issued **/**/2017, Address, ** Belmar Terrace, Philadelphia[.]

- 25 -

Sadeen Jones' criminal history includes arrests for Robbery and Murder.

On November 1, 2017, your Affiant received and reviewed Sadeen/Jamal Jones' AT&T Mobility cell records and confirmed Jones as the account holder. It was noted that on the morning of the Robbery, August 21, 2017, between 0200-0235 hours, there were cell exchanges with a third cell number, (***)***-4478.

Your Affiant confirmed with T-Mobile/Metro PCS that they are the cell provider for cell number (***)***-4478 and cell phone records are available to law enforcement upon request. Your Affiant believes that the warrant for T-Mobile/Metro PCS cell (***)***-4478 will provide evidence in the ongoing investigation to identify participants and recover the Nadav family's stolen property.

Your Affiant requests that T-Mobile/Metro PCS be ordered not to disclose to the user of cell number (***)***-4478 that this information has been requested and disclosed, as Your Affiant is concerned that the user of that phone may interfere with the ongoing investigation.

WHEREFORE, your Affiant submits that there is probable cause to believe that the requested records are relevant and material to an ongoing investigation into violation(s) of the following criminal offenses; (1) Robbery, (2) Forgery, (3) Access Device Fraud, (4) Identity Theft, (5) Theft By Unlawful Taking, (6) Receiving Stolen Property, and (7) Criminal Conspiracy.

Exhibit CS-6, Application for Search Warrant, Affidavit, filed 7/3/18.

Based on the totality of the circumstances set forth in the affidavit, we agree with the trial court that there was a fair probability that evidence of a crime would be found upon examination of the cell phone records for (***)***-4478. **See Gates**, **supra** (setting forth probable cause standard).

As indicated in the affidavit of probable cause, during the home invasion the victims observed three perpetrators who used their cell phones to communicate with each other. After the police determined Marlon Burton had

used credit cards stolen from the Nadav residence, Burton admitted to the police that Daniels gave her the credit cards during the early morning hours shortly after the home invasion had occurred.

An examination of Daniels' cell phone records revealed that, during the home invasion, Daniels used his cell phone to communicate with Jones, who in turn used his cell phone to communicate with (***)***-4478. A common sense reading of the affidavit reveals there was a fair probability that the owner of cell phone (***)***-4478 participated in the home invasion and/or would have information in connection with the identity of the perpetrators or recovery of the stolen items. *Id.*

To the extent Appellant contends probable cause was lacking because the police did not identify Appellant by name in the affidavit, we disagree. The identification of the specific cell phone number, *i.e.*, (***)***-4478, and the request for the cell phone records from T-Mobile/Metro PCS for a specific time with regard thereto, sufficiently described with particularity the item to be seized and searched. *See Commonwealth v. Kane*, 210 A.3d 324 (Pa.Super. 2019) (indicating a warrant must state with sufficient particularity the property to be seized and the person or place to be searched). Accordingly, we conclude the search warrant was supported by probable cause, and therefore, the trial court properly denied Appellant's motion to suppress the historical cell-site location information pertaining to his cell phone.

In his final claim, Appellant contends his aggregate sentence of forty years to eighty years in prison is manifestly excessive in that the trial court abused its discretion in imposing some sentences consecutively, as opposed to concurrently, without properly considering the need to protect the public, the gravity of the offense in relation to the impact on the victim and community, and the rehabilitative needs of Appellant. He avers the trial court focused primarily on the nature of the offense without adequate consideration of the mitigating factors.

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *See Commonwealth v. Moury*, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted).

In the case *sub judice*, Appellant filed a timely notice of appeal, preserved his issue in his motion for modification of sentence, and included a Pa.R.A.P. 2119(f) statement in his brief. Turning to the fourth requirement, we have found that a substantial question exists "when the appellant advances a colorable argument that the sentencing judge's actions were either: (1)

inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa.Super. 2008). Assuming, *arguendo*, Appellant has presented a substantial question for our review, we conclude no relief is due.

We are mindful that:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa.Super. 2006).

"Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the 'minimum possible' confinement." *Moury*, 992 A.2d at 171 (citation omitted). In reviewing the sentence, an appellate court shall have regard for: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. *See* 42 Pa.C.S.A. § 9781(d)(1)–(4).

Further, 42 Pa.C.S.A. § 9721(b), pertaining to sentencing generally, relevantly provides:

> **(b) General standards.**—[T]he court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant....In every case in which the court imposes a sentence for a felony or misdemeanor...the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.

42 Pa.C.S.A. § 9721(b) (bold in original).

Nevertheless, "[a] sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question[.]" **Commonwealth v. Crump**, 995 A.2d 1280, 1283 (Pa.Super. 2010). "Rather, the record as a whole must reflect the court's reasons and its meaningful consideration of the facts of the crime and the character of the offender." **Commonwealth v. Malovich**, 903 A.2d 1247, 1253 (Pa.Super. 2006) (citation omitted).

In the case *sub judice*, the trial court was provided with a sentencing memorandum in which the Commonwealth noted Appellant had two prior juvenile adjudications of delinquency, as well as a prior conviction in 2011 for robbery and burglary. N.T., 5/23/19, at 11. Similar to the instant burglary, the 2011 incident involved a home invasion at gunpoint. *Id.* After Appellant declined to exercise his right of allocution, *id.* at 33, his attorney made the following statement for the court's consideration:

I have known [Appellant] now for at least six months, perhaps a bit more, and I have had an opportunity to talk to him on literally dozens of occasions at the Bucks County prison.

He's a thoughtful man and he was cooperative with me, and he's a gentleman, all of which might sound incongruous considering the facts of this case, but it is true nevertheless.

[Appellant] is a high school graduate. He is only 25 years of age. His prior robbery, which was alluded to by the district attorney, occurred when he was 16 years of age.

He has a large nuclear family. His mother, Ruth Davis…[a]nd his wife, Shavonna Baker, is also here and they were here during the course of the trial. You may recall that Ruth Davis testified at the trial.

He has four children by Shavonna Baker. They're aged nine, six, three, and one. He has the support of his family. He asks the Court to consider using the guidelines as a basis for a sentence in this case.

I don't make any argument regarding how he falls within that guideline, but I think it is at least a starting point for the Court to consider when imposing a sentence on a serious case like this.

I ask for the same thing that co-counsel have asked for. He's facing a serious sentence. I ask you not to make it a life sentence.

It's clear that based on the sentencing that took place in [co-conspirator Daniels' case] that the capacity to impose a life sentence is here and I ask the Court to consider that the first offense took place when [Appellant] was 16 and he is 25 years of age and I sincerely believe that he is not only capable of rehabilitation, but would be a good father to his children and he hopes to see them some day after he gets---pays his dues for this very serious crime.

*Id.* at 37-38.

In sentencing Appellant, the trial court relevantly stated the following

on the record:

There are a number of people in the courtroom who have just come to observe. There are a number of people who have come because they, you know, are victims or are here to support

victims. There are people who are here to support the individuals who have been convicted of very serious offenses.

What strikes me in this case more than anything else is the palpable despair on the one side of the courtroom. The pain and trauma that [Appellant and his co-conspirators] imposed on their own families is beyond my ability to articulate. They look to me to save them from the pain you have caused.

I was emotional when I watched your family members testify. They are people that didn't do anything to deserve the pain they're going through right now, the—but they're in that pain and I can't—I can't help them.

And to the extent that I have to sentence you, I am going to hurt them even more because I can't stop from putting you in prison because I can't allow you to continue to victimize people over and over and over again.

What strikes me also is that there's equal pain on the other side of the courtroom and trauma on the other side of the courtroom.

The only people who haven't demonstrated to me that they're undergoing any pain and trauma are [Appellant and his co-conspirators].

\*\*\*

They've had to sit through your arrests and trials and sentencings and incarcerations, had to raise children on their own, had to visit you in whatever state facility was housing you at the time.

They were in the same pain then as they are now; and then, rather than coming out and saying, "I will never—I don't care what you think of other people in the world, but I won't do it to the people who love me," you didn't. I can't understand that. I cannot explain that.

But the pain they are undergoing today—let's make no mistake about it—is inflicted by you. It's not society. It's not me. It's not [the assistant district attorney]. It's not the victims. Nobody made you go and buy guns, borrow guns, steal guns, however you got guns; you are not even supposed to have them; dress up military style, in military style do a practice run for a time and efficiency. It was a commando raid into a private residence.

And we heard from very heart—heartfelt statements from the family that there were three sisters that belonged to that

household….In the middle of the night, [] two of the youngest girls, Elle and [C.N.], are awoken with strange men in their bedrooms.  I can't imagine the confusion, the fear, the nightmare.

***

I wanted to make sure that I understood exactly the nature of the crime being charged because the price you are going to pay is going to be very steep because you made, despite the constant intervention of the criminal justice system, which made available to you whatever it is you needed, whether you needed drug treatment or emotional treatment or psychiatric treatment or job training---whatever it is that you needed was available while you were in the…system….Whether you took advantage of that or attempted to take advantage of that, I don't know, but what I do know is it had absolutely no impact on your conduct.

You decided to engage in one of the most serious crimes that you could possibly engage in: The robbery of five separate individuals, conspiracy to rob five separate individuals, burglary, [and] unlawful restraint.

Three generations of the same family were victimized.  You were organized, efficient, sophisticated.  There is no more dangerous a situation that I can image than the danger that you created in that household that morning.

As I said before, the impact of the crimes—that doesn't—I can't even describe it and I don't have to.  It doesn't take any depth to understand what you—what impact these offenses would have on the people that you chose to victimize.

***

You have an education.  You have a—you had potential employment, of actual employment.  You are articulate.  So there's no basis to do these criminal offenses, but greed.

I keep trying to find some mitigating circumstances, if any, in these cases and I can only find one.  Despite the trauma of your—in your childhood…it doesn't explain why you want to hold a gun to a 12-year-old's head or why you would want to threaten a college student that she'd be shot down maybe on campus[.]  It doesn't explain that.

As victims of violence, you should have—you are in the unique situation to understand the harm that causes.

***

[Appellant] has a…severe criminal history. He was adjudicated for burglary in 2005, the same criminal offense that he has been convicted of yet again.

He was adjudicated of robbery, a Felony 3 in 2008; again, the same criminal offense that he was convicted of again; and, finally, he was convicted in 2011 of robbery and burglary, both felonies of the first degree, which, again, he was convicted.

So [Appellant] has demonstrated to me that although his crimes may have started at 16 years old, they have continued into adulthood consistently. He has engaged in the same violent, felony behavior from 2005 through the incident involved in this case.

*Id.* at 49-52, 54-56, 59-60.

Moreover, in its opinion, the trial court indicated the following in urging

this Court to reject Appellant's sentencing claim:

Contrary to [Appellant's] assertion, [the trial] court considered all the factors set forth in Section 9721(b) in imposing sentence. As to the protection of the public and the gravity of the offense as it relates to the impact on the victim and the community, [the trial] court noted that this home invasion robbery was highly organized, efficient, and sophisticated. The conspirators first scouted the location and then conducted a commando-style raid of a private residence occupied by three generations of one family in the middle of the night. [The trial] court also noted that the force utilized was extreme. [Appellant and his co-conspirators], outfitted with dark clothing, gloves, and masks and brandishing handguns, threatened each of the victims with the loss of their own life as well as the death of the other family members, including a member of the family that was away at college. Finally, [the trial] court considered the apparent and undeniable impact these vicious and violent offenses had on the victims. The fact that [Appellant] ha[s] engaged in violent offenses in the past and chose to once again engage in extremely violent conduct with other violent offenders, convinced [the trial] court that the protection of the public required a substantial period of incarceration[.]

[The trial] court also discussed how the nature of the offenses reflected on [Appellant's] character and his amenability

- 34 -

to rehabilitation. [The trial] court specifically noted that, despite the extreme violence and apparent raw fear and emotional trauma inflicted, [Appellant] showed no emotional response and demonstrated no empathy or remorse. [The trial] court found that there was no demonstrable economic need, explanation or justification for these crimes and therefore concluded that [Appellant] was motivated by greed. [The] court also considered the character of the individuals with whom [Appellant] chose to conspire, noting that [Appellant] was aware of their violent character and still made a conscious decision to participate. Given the number of conspirators, their violent tendencies, the fact that they were all armed, and the unpredictability of victims' responses to their physical incursion, [Appellant] knew or should have known that there was a substantial risk that the situation could have gotten out of control and that someone could have been seriously injured or killed.

In considering [Appellant's] history, character, condition, and rehabilitative needs, [the trial] court also considered [Appellant's] prior record. In 2005, [Appellant] was adjudicated delinquent of Burglary, in 2008 he was adjudicated delinquent of Robbery and Burglary, and in 2011 he was convicted of Robbery, the same offenses of which he was convicted in the instant case. [The trial] court found that the intervention of both the juvenile and adult criminal justice systems had no deterrent effect on [Appellant's] criminally violent behavior. [The trial] court also found that the support of [Appellant's] family and friends and the impact of his criminal behavior has had on them also had no deterrent effect on his criminally violent behavior. [The trial] court therefore concluded that the sentence imposed was necessary to prevent [Appellant] from engaging in further acts of violence.

[Appellant's] remaining claims…argue that the sentence imposed is "tantamount to a life sentence," is unreasonable and excessive given the nature and circumstances of the case and the history and character of [Appellant,] and that therefore the [trial court] abused its discretion in imposing sentence.

\*\*\*

As explained above, in imposing sentence, [the trial] court considered all of the factors set forth in the Sentencing Code including the protection of the public, the gravity of the offense, the history, character, condition and rehabilitative needs of [Appellant] and the sentencing guidelines. The fact that [the trial]

- 35 -

court did not weigh the factors as [Appellant] might have wished is not sufficient to support a claim for appellate relief.

\*\*\*

The fact that the sentences for the Robbery of Elle Nadav, Manya Guravich[,] and C.N. were run consecutive to one another and consecutive to the concurrent sentences imposed for the Robbery of Jonatan [*sic*] and Emily Nadav does not alter the conclusion that the sentences imposed were reasonable. In imposing sentence, a court has discretion to run the sentence concurrently with or consecutively to other sentences being imposed. Moreover, separate felony offenses committed against separate victims appropriately calls for consecutive sentences. ***Commonweath v. Swope***, 123 A.3d 333, 341 (Pa.Super. 2015) (citation omitted) ("Appellant is not entitled to a volume discount for his crimes.")[.] Where, as here, separate violent felony offenses were committed against multiple individuals, a separate sentence is warranted in recognition of the fact that separate and distinct harms were intended and separate and distinct harms were caused by the commission of each criminal act committed by [Appellant] and his accomplices.

Trial Court Opinion, filed 2/5/20, at 17-22 (citations omitted).

We find no abuse of discretion. The record reveals the trial court imposed four consecutive sentences for the robbery of Jonathan Nadav, C.N., Elle, and Manya. The trial court imposed either concurrent sentences or no further penalty for Appellant's remaining convictions, including imposing a concurrent sentence for the robbery of Jonathan's wife, Emily. In so doing, the trial court considered the mitigating factors,[14] along with the need to

---

[14] To the extent Appellant suggests the trial court completely disregard the testimony of his mother, Ruth Davis, who testified Appellant's paternal grandmother abused Appellant while he was living with her, we note Mrs. Davis gave this testimony at the September 13, 2019, post-sentence motion

protect the public, the gravity of Appellant's offenses on the victims and community, and Appellant's rehabilitative needs. 42 Pa.C.S.A. § 9721(b). We agree with the trial court that Appellant was not entitled to a "volume discount" by having all of his sentences run concurrently. *See Swope*, *supra*.

For all of the foregoing reason, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/23/20

---

hearing. N.T., 9/13/19, at 17-18. At the conclusion of the hearing, the trial court noted that, in sentencing Appellant, it took into account Appellant's "upbringing[.]" *Id.* at 31. However, the court further noted that, "at some point you become responsible and it is no longer because something happened to you when you are a child. At some point it becomes a conscious decision to make a decision that this is the life I am going to live." *Id.* at 34.