J-S18007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DWAYNE LYNCH | : | |
| | : | |
| Appellant | : | No. 918 EDA 2020 |

Appeal from the Order Entered February 28, 2020
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005121-2018

BEFORE: PANELLA, P.J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.: **FILED NOVEMBER 08, 2021**

Dwayne Lynch appeals from the judgment of sentence entered on October 11, 2019, as made final by the denial of post-sentence motions on February 28, 2020.[1] A jury convicted Lynch of one count of involuntary manslaughter and three counts of recklessly endangering another person ("REAP") arising from the shooting death of Robert Colter, III. During the investigation, police secured a court order, and subsequent search warrant,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In his notice of appeal, Lynch purports to appeal from the February 28, 2020, order denying the post-sentence motions. However, "in a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." ***Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*). Accordingly, Lynch's appeal properly lies from the October 2019 judgment of sentence. Therefore, we have corrected the caption accordingly. ***See id.*** (correcting caption when appellant misstates where appeal lies).

which authorized the disclosure of historical cell-site location information ("CSLI") related to Lynch's cellphone number. This evidence was highly relevant to the case because it revealed Lynch's movements on the night of the shooting and confirmed an inculpatory recitation of events regarding that fateful day as provided by Lynch's cousin, Rodney Beaty. On appeal, Lynch argues the court erred in refusing to suppress the CSLI evidence. Lynch also raises weight and discretionary aspects of sentencing challenges. We affirm.

In the early evening of February 16, 2016, Colter was gunned down while standing outside of his home in Bristol Borough, Pennsylvania. Witnesses described two masked shooters, who fired a total of at least six shots at Colter. One of these shots hit Colter in the head, ultimately leading to his death. The perpetrators fled in a small, red car with a hatchback that was being driven by a third male individual.

Less than a month later, Bristol Borough police received a complaint from Colter's family. Three young men were repeatedly driving by their home and holding their hands to resemble guns. The Colters gave a description of the vehicle involved, which led police to a vehicle being driven by Jaquan Wilkerson on March 9, 2016. Wilkerson was already a person of interest in the Colter shooting, as police had received information that Wilkerson and his friends had a conflict with Colter. Wilkerson was subsequently questioned by police and he provided his mobile phone number and consented to a search of his mobile phone.

Detectives also spoke with A.S., Wilkerson's girlfriend. During her interview, the detectives received information concerning a new phone number, which they believed to be Wilkerson's second phone. They obtained a court order for that number pursuant to the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5701-5782 ("Wiretap Act") on May 11, 2016 ("the May 2016 order"). Contrary to their expectations, the subscriber information from AT&T showed that since 2013, the account holder was Lynch. Moreover, the address associated with the cell phone was 1011 Winder Drive in Bristol, Pennsylvania. *See id.*, at 17.

Based on the information contained in the cell records, Detective Hanks subsequently determined that Lynch possessed or utilized a red vehicle. Detective Hanks noted that members of law enforcement observed a red car twice at the 1011 Winder Drive residence. The car was registered to Lynch's mother who lived at that same address.

Eventually, Detective Hanks's investigation led to Beaty, who told the detective an incriminating story regarding the night of the shooting. Beaty admitted that he, Lynch, and Wilkerson had been involved with the shooting. Beaty revealed that earlier on the day of the shooting, he and Lynch were driving around in Lynch's mother's red Chevrolet Sonic, drinking, smoking marijuana, and dealing heroin and cocaine. At some point, Wilkerson contacted Beaty through Facebook Messenger, asking to be picked up at a 7-11 in Croydon, Pennsylvania.

After Beaty and Lynch picked up Wilkerson, Wilkerson indicated that he wanted to rob Derron Thompson, another local drug dealer. When they passed Thompson on the street, Beaty parked the car nearby and waited while Lynch and Wilkerson armed themselves with firearms. Lynch and Wilkerson covered their faces and walked towards where they believed Thompson to be. Beaty heard multiple gunshots, and then Lynch and Wilkerson returned to the car in a panic, yelling at Beaty to leave quickly. As they drove away, Wilkerson said, "I think we dropped one." N.T., 4/25/2019 (A.M.), at 28.

Detective Hanks checked Beaty's story against the CSLI data provided by the mobile phone carrier. The location data for Wilkerson's and Lynch's phones corresponded closely to the story told by Beaty. After an intervening Supreme Court of the United States decision caused him to question the legality of the May 2016 order, Detective Hanks obtained a search warrant on July 11, 2018 ("the July 2018 search warrant") for Lynch's cellular telephone number for the period of February 16, 2016, to February 17, 2016. *See* N.T., 4/3/2019, at 179. No new records were obtained from the July 2018 search warrant.

Lynch and Wilkerson were subsequently arrested and charged with numerous offenses related to the shooting. Lynch filed several pre-trial motions, including a motion to suppress phone records obtained by the May 2016 order. *See* Supplemental Omnibus Pretrial Motion, 3/20/2019, at 13-14.

The court held four pre-trial hearings between January and April 2019, after which the court denied Lynch's motion to suppress.

On April 22, 2019, Lynch and Wilkerson's joint trial began.[2] At the conclusion of nine days of trial and three days of deliberations, the jury found Lynch guilty of one count of involuntary manslaughter and three counts of REAP.[3] The court then imposed the following sentence on Lynch: (1) two and a half to five years' incarceration for the involuntary manslaughter conviction; (2) and two consecutive terms of one to two years for two of the REAP offenses. The sentences were outside of the aggravated range of the sentencing guidelines, but not beyond the maximum sentence allowable by law. The court imposed no further penalty regarding the third count of REAP. Lynch filed post-sentence motions for a new trial and/or in arrest of judgment. The court held a hearing on February 28, 2020, and denied the motions. This appeal followed.[4]

---

[2] Also in April, Beaty pled guilty to third-degree murder, conspiracy to commit third degree murder, and three counts of REAP in connection with the February 2016 shooting. He was subsequently permitted to withdraw his plea for the murder charge and pled guilty to involuntary manslaughter. The conspiracy charge was *nolle prossed*. He received an aggregate sentence of 21 to 78 months' incarceration.

[3] The jury also found Wilkerson guilty of one count of involuntary manslaughter and three counts of REAP.

[4] Wilkerson filed a direct appeal, which is docketed at No. 883 EDA 2020.

In his first argument, Lynch complains that the trial court erred in denying his motion to suppress the CSLI evidence captured from his mobile phone. As all parties acknowledge, the May 2016 order was based on reasonable suspicion pursuant to then-controlling law. However, all parties concede that reasonable suspicion is no longer sufficient pursuant to *United States v. Carpenter*, 138 S.Ct. 2206 (U.S. 2018). As will be discussed in detail below, the *Carpenter* Court held that requests for historical cell site records from wireless carriers constituted a "search" within the meaning of the Fourth Amendment of the United States Constitution, thereby generally requiring a warrant supported by probable cause. *Id.*, at 2221.

It is also undisputed that the May 2016 order and its supporting documentation was incorporated into the application for the July 2018 search warrant. However, Lynch contends that the July 2018 search warrants relies solely on Beaty's version of events on the night of the shooting and refers to the May 2016 order and supporting affidavit of probable cause, which indicated that Lynch's phone number was obtained after investigators spoke with Lynch's federal probation officer. *See id.*, at 24. Lynch alleges that a fact, which is not addressed in the affidavit of probable cause, is "that Lynch's phone was identified by his federal probation officer [and] that the search by which the phone was seized by federal authorities was suppressed by the United States District Court for the Eastern District of Pennsylvania." *Id.*, at 24-25. He directs us to the federal district court's memorandum opinion, which

he attached to his brief, and states that there, the district court held that the stop related to the seizure of the phone was not based on reasonable suspicion and evidence of the phone number was suppressed. ***See id.***, at 25-26. Lynch purports that as a result, the 2018 search warrant was based on statements from an unreliable witness and information that was obtained "in violation of [his] Fourth Amendment rights." ***Id.***, at 26.

Lynch also cites to ***Commonwealth v. Fulton***, 179 A.3d 475 (Pa. 2018), for the principle that "accessing any information from a cell phone without a warrant contravenes" the United States Supreme Court's precedent of ***Riley v. California and United States v. Wurie***, 573 U.S. 373 (2014) ("***Riley***/***Wurie***"). ***Fulton***, 179 A.3d at 479. Lynch further contends:

> Neither ***Carpenter*** nor ***Fulton*** were decided at the time the initial search of [his] phone took place in May of 2016, but both courts clearly state that in order to search through a person's technology or for law enforcement to use the technology, a warrant must be obtained…. To hold that, because [Lynch]'s phone was searched in 2016, he is not entitled to the same rights as a defendant whose phone was searched after February or June of 2018, strains the imagination. Either ***Fulton*** and ***Carpenter*** and ***Riley***/***Wurie*** created a new right, based in the Fourth Amendment to the U.S. Constitution or [Article I, Section 8] of the Pennsylvania Constitution, or such a new right is somehow not a right at all. Regardless, at the time of the May 16 court order, the United States Supreme Court had made it clear that a warrant was required to search a phone. ***Carpenter***, in 2018, merely clarified that a warrant was also necessary to gain information regarding the location of a phone.

Appellant's Brief, at 30-31.

Lastly, Lynch complains about the trial court's reliance on ***Commonwealth v. Taylor***, 850 A.2d 684 (Pa. Super. 2004). He states that

certain information concerning Beaty's unreliable statements to police was omitted from the affidavit of probable cause that was attached to the search warrant. He concludes the warrant was, therefore, not supported by probable cause because it was based upon false statements and an unconstitutional seizure of his phone. *See* Appellant's Brief, at 32-33.

Our Court's standard of review for a suppression issue is deferential to the suppression court's findings of fact, but not its conclusions of law:

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (internal citations omitted).

As noted above, law enforcement used information gained from the CSLI of Lynch's and Wilkerson's mobile phone numbers to track their movements on the day of the shooting. In *Carpenter*, the Supreme Court described how a cell phone's movement is tracked as follows:

Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites." Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings. Cell sites typically have several directional antennas that divide the covered area into sectors.

Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter*, 138 S. Ct. at 2211-2212.

"Both the Fourth Amendment of the Constitution of the United States and Article 1 Section 8 of the Constitution of the Commonwealth of Pennsylvania protect citizens from unreasonable[] searches and seizures." *Commonwealth v. Pacheco*, 227 A.3d 358, 366 (Pa. Super. 2020). Here, the police obtained the May 2016 order for Lynch's number pursuant to

Section 5743(c) of the Wiretap Act, which permits a provider of electronic communication services to disclose "a record or other information pertaining to a subscriber to or customer of service," other than contents of communications, to law enforcement officers when officers used one of several means, including a court order. 18 Pa.C.S.A. § 5743(c)(2). The statute also provides the requirements for the issuance of court order are that the investigating officer demonstrate "there are specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 Pa.C.S.A. § 5743(d).

In 2018, the United States Supreme Court was confronted with "how to apply the Fourth Amendment to a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals…. [because m]uch like GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled." **Carpenter**, 138 S. Ct. at 2216. There, the prosecutors applied for court orders under the Stored Communications Act, 18 U.S.C.A. § 2703,[5] to obtain cell phone records for the defendant and several other suspects. The federal statute "permit[ed] the Government to compel the disclosure of certain telecommunications records

---

[5] The Stored Communications Act shares similar language to the Wiretap Act, including the "reasonable grounds" standard. **See** 18 U.S.C.S. § 2703(d).

when it offers specific and articulable facts showing that there are reasonable grounds to believe" that the records sought were "relevant and material to an ongoing criminal investigation." ***Carpenter***, 138 S. Ct. at 2212 (citation and quotation marks). The Court held, for the first time, that law enforcement officials violated an individual defendant's Fourth Amendment rights by obtaining his historical cell site location information from a third-party carrier without first obtaining a search warrant supported by probable cause. ***See Carpenter***, 138 S.Ct. at 2216.

We note that shortly after ***Carpenter*** was decided, police in the present matter applied for and obtained the July 2018 search warrant for Lynch's cell phone.

Following ***Carpenter***, this Court issued ***Pacheco***. In that case, police were conducting a heroin-trafficking investigation and had obtained several orders pursuant to the Wiretap Act to secure real-time CSLI tracking. The ***Pacheco*** Court extended the ***Carpenter*** rationale to real-time CSLI tracking records and held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through real-time CSLI. As such, when prosecutors sought and obtained real-time information about Pacheco's location by pinging his cell phone, they conducted a search under the federal and state constitutions." ***Pacheco***, 227 A.3d. at 370 (quotation marks omitted). In determining the order satisfied the warrant

requirement, the Court relied on a United States Supreme Court decision,

***Dalia v. United States***, 441 U.S. 238 (1979), which stated:

> The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Finding these words to be precise and clear, this Court has interpreted them to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

***Id.***, at 255 (citations and quotation marks omitted).

Subsequently, in ***Commonwealth v. Davis***, 241 A.3d 1160 (Pa. Super. 2020), *appeal denied*, 253 A.3d 211 (Pa. 2021),[6] a panel of this Court considered a similar challenge to the one being raised by Lynch. There, like in the present matter, the Commonwealth had secured a court order directing the wireless carrier to provide the requested cell phone records, including the historical cell-site location records for the appellant's cellular telephone for a three-month period in 2017. ***See id.***, at 1164. After the ***Carpenter*** decision came down, but prior to the defendant's trial, the police secured a search warrant for the historical cell-site location records. The defendant

---

[6] ***Davis*** was filed the same day the trial court issued its Rule 1925(a) opinion; therefore, it did not have the benefit of that decision. Nevertheless, "the general rule in Pennsylvania is to apply the law in effect at the time of the appellate decision." ***Commonwealth v. Housman***, 986 A.2d 822, 840 (Pa. 2009).

subsequently filed a post-sentence motion alleging the trial court erred in denying his motion to suppress the historical cell-site location records for his cell phone. *Davis*, 241 A.3d at 1170.

On appeal, the defendant argued that suppression of his historical cell-site location records was necessary under federal and state constitutions because law enforcement initially obtained the evidence pursuant to the wiretap orders which only required that the officer demonstrate "reasonable grounds for believing that the records are material to an ongoing investigation, which is a lesser standard than the probable cause standard mandated by *Carpenter*," and, therefore, the order was not a constitutionally valid substitute for a proper search warrant. *Davis*, 241 A.3d at 1171. The appellant also asserted that even though the police subsequently obtained a search warrant, it "did not purge the taint of illegality from the prior seizure of the records," and lastly, "the police's affidavit of probable cause for the search warrant did not set forth the necessary probable cause." *Id.*

In response, the Commonwealth acknowledged the initial acquisition of the cell-site location records was unlawful in the wake of *Carpenter*, but alleged that "the post-*Carpenter* search warrant purged any taint of illegality resulting from the initial seizure such that there is no need for exclusion of the evidence." *Davis*, 241 A.3d at 1172.

The *Davis* panel rejected the appellant's argument and applied the inevitable discovery doctrine to the matter. Under the inevitable discovery

doctrine, "if the prosecution can establish by a preponderance of the evidence that illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible." *Id.* (citation and quotation marks omitted). Relying on another decision by this Court, the *Davis* panel stated:

> In *Commonwealth v. Berkheimer*, 57 A.3d 171 (Pa. Super. 2012) (*en banc*), this Court reviewed the development of the inevitable discovery doctrine and explained that Pennsylvania courts have interpreted the doctrine more narrowly based on the understanding that the exclusionary rule serves an essential role in safeguarding the right to privacy under Article I, Section 8. This Court explained that in cases where evidence is gathered through a substantially unwitting violation of the warrant requirement, devoid of any cognizable misconduct, the inevitable discovery doctrine in Pennsylvania is coterminous with its application under the Fourth Amendment. This standard requires a finding that the law enforcement officer's decision to seek a warrant was prompted by information independent of what was learned during the unlawful search and the information illegally obtained did not influence the issuing authority's decision to issue the search warrant.

*Davis*, 241 A.3d at 1172 (citations and quotation marks omitted).

In affirming the trial court's decision, the *Davis* Court highlighted the following: (1) the parties did not dispute the fact that "the police did not commit any cognizable misconduct when they initially seized the cell-site location records in November of 2017 via a court order;"[7] (2) after the Supreme Court issued *Carpenter*, the police secured the same records with a search warrant; (3) in the affidavit of probable cause attached to the search

---

[7] *Id.*, at 1172 (citation and quotation marks omitted).

warrant, the police did not use any information that they had obtained as a result of the initial seizure of the defendant's cell phone records; and (4) the cell phone records were initially seized via a court-authorized order because that was the law in effect at the time. **Davis**, 241 A.3d at 1172-1173.

Based on this evidence, the **Davis** Court concluded "the Commonwealth demonstrated by a preponderance of the evidence that the police committed "a substantially unwitting violation of the warrant requirement, devoid of any cognizable misconduct" when the evidence was initially seized, and the evidence would have been ultimately discovered by lawful means." **Id.**, at 1173 (citation and quotation marks omitted). The Court further stated that "the evidence was sufficiently purged of any original illegality to allow its admission under the inevitable discovery doctrine." **Id.** (citation omitted).

Turning to the present matter, the suppression court found that the May 2016 order satisfied the probable cause standard as discussed in **Carpenter** and applied in **Pacheco**. The affidavit attached to the order contained the following information: (1) cell phone records gained through a consensual search of Wilkerson's phone indicated that on February 16, 2016, Wilkerson traveled from Croydon to Bristol Borough and was in the area of the shooting at the time of the shooting and then went to Philadelphia following the incident; (2) A.S. provided a second cell phone number for Wilkerson; (2) records showed multiple contacts between the second number and A.S. on the night of the shooting. **See** Trial Court Opinion, 10/23/2020, at 26. The

affidavit also stated the cell phone data would show "contacts, movements, and relationship" between Wilkerson and the scene of the shooting. **Id.** (citation omitted).

The court stated:

Based on the above proffers by the Affiant, as well as the statements gathered in the affidavit that set out that A.S. and Wilkerson had knowledge of disputes going on in rival rap groups in the area and knew that the victim was associated with one of the groups, the original affidavit provided probable cause to retrieve the information from the cell phone…. In other words, the information would aid in the apprehension and conviction of those involved in the shooting of Robert Colter, III. Moreover, the Order, signed by a neutral and disinterested court, was focused as to the time the cell phone information could be elicited…. The Order here was extremely specific and narrow as to the things to be seized … and the place to be searched (cell site information on the date of the shooting).

**Id.**, at 26-27 (citations and quotation marks omitted).

Our review of the record confirms the trial court's analysis. The May 2016 order satisfied the three search warrant requirements of **Dalia**, and therefore, the search of the historical CSLI information pursuant to the earlier order was legal. **See Pacheco**.

In any event, even if the May 2016 order was purportedly unlawful in the wake of **Carpenter**, we find that **Davis** is dispositive of the argument before us. Similar to **Davis**, here, the parties did not dispute the fact that law enforcement did not commit any cognizable misconduct when they initially seized the historical CSLI records in May 2016 *via* the court-authorized order; (2) shortly after the Supreme Court issued **Carpenter**, the police secured the

- 16 -

same CSLI records with the July 2018 search warrant; (3) in the affidavit of probable cause attached to the search warrant, the police did not use the CSLI records obtained from the May 2016 order; and (4) the historical CSLI records were initially seized via a court-authorized order because that was the law in effect at the time. *See Davis*, 241 A.3d at 1172-1173. Accordingly, we conclude "the evidence was sufficiently purged of any original illegality to allow its admission under the inevitable discovery doctrine." *Id.* (citation omitted). Therefore, Lynch's suppression argument based on *Carpenter* warrants no relief.

Furthermore, Lynch's reliance on *Riley*/*Wurie* and *Fulton* is misplaced. Those cases concern searches of mobile phones incident to arrest. For example, in *Riley*/*Wurie*, the Supreme Court stated, "These cases require us to decide how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*/*Wurie*, 573 U.S. at 385. The Court held that when dealing with a search incident to arrest, the "officers must generally secure a warrant before conducting such a search." *Id.*, at 386. *Riley*/*Wurie* and *Fulton* are clearly distinguishable from the present matter as Lynch's phone was not searched incident to his arrest, the actual contents of his phone were not searched, and a court-authorized order preceded the search.

Lastly, to the extent Lynch argues that law enforcement used statements made by Beaty that were unreliable and incorrect to obtain the July 2018 search warrant, we note that we have already concluded that the May 2016 order, which did not rely on Beaty's story, was based on probable cause. However, even if we had not, we agree with the trial court's well-reasoned analysis of Detective Hanks's selection of information to provide in his affidavit:

Detective Hanks testified that he did not include every conflicting statement from every witness in the affidavits because, "[w]e try and take the best information and the totality of the circumstances for what we have, which will prove the charges for the criminal complaint..." For example, Detective Hanks also did not mention multiple statements which corroborated Beaty's statements in the affidavits. He testified that the summary of the June 7, statement by Beaty that was contained in the affidavits was information that he could corroborate through other sources, for example, the caliber of the magazine that was dropped at the scene. However, the Detective did state that Beaty was the only source of the information as to who fired a weapon and which weapon was used. Detective Hanks testified that he did not willfully omit any information from the affidavits or remove any information regarding Beaty's statements in an attempt to confuse or deceive the Court.

In **Commonwealth v. Taylor**, 850 A.2d 684 (Pa. Super. 2004), the Superior Court reiterated the holding of the Third Circuit in **Frost**, "where an omission rather than a misrepresentation is the basis for a challenge to an affidavit for an arrest warrant, a court should inquire as to whether the … affidavit would have provided probable cause if it had contained a disclosure of the omitted information." **Commonwealth v. Taylor**, 850 A.2d 684, 687 (Pa. Super. 2004)(citing **United States v. Frost**, 999 F.2d 737 (3d Cir. 1993). In this case, there would be probable cause even if the affidavit included the inconsistent statements because Beaty's statement is consistent with records for Wilkerson's phone, A.S.'s phone records, and the physical evidence at the scene.

- 18 -

…

       Generally, a defendant may attack the issuance of a warrant if based on untruthful information. A warrant does not need to be "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct. In order to succeed in attacking a warrant[,] a defendant must come forward with allegations of deliberate falsehood or of reckless disregard for the truth, and these allegations must be accompanied by an offer of proof. Here, the detective did not place "untruthful" or "incorrect" information in the warrant. Again, after hearing evidence presented at the pre-trial suppression hearing on April 3, 2019, this court ruled on April 10, 2019, that both the Order and the second warrant contained probable cause to obtain the phone records and cell site, information. Therefore, the original Order and the warrant were supported by probable cause and any evidence obtained is not fruit of the poisonous tree.

Trial Court Opinion, 10/23/2020, at 27-30 (some citations, quotation marks, and one footnote omitted). In light of all of the above, Lynch's arguments against the suppression court's ruling merit no relief.

Next, Lynch asserts the verdict was against the weight of the evidence in light of the trial court's failure to admit the results of Beaty's polygraphs and his inconsistent statements. **See** Appellant's Brief, at 34. Lynch alleges that when Beaty first cooperated with the investigation, he denied any responsibility and blamed another juvenile (not Wilkerson). **See id.**, at 35. Lynch also states Beaty submitted to "polygraph examinations and was found to be deceptive regarding the homicide as well as to the participants of that crime," but the trial court did not permit testimony regarding the results of these polygraph tests. **Id.**, at 36. Lynch contends:

Here, the lack of knowledge by the jury that Beaty had given multiple statements over more than a year before failing two polygraphs was relevant and critical evidence that should have been presented to the jury. It is clear from the verdicts in this case that the jury simply did not believe Beaty and evidence that Beaty had lied to such an extent that investigators used two polygraphs would have given the jury a substantially more fulsome picture of this case.

*Id.*, at 39-40. He continues:

If Beaty's testimony was truthful … and was uncontradicted, there clearly would have been evidence presented of sufficient weight to convict [Lynch] and Wilkerson of involuntary manslaughter and reckless endangerment. There would also have been evidence of sufficient weight to convict the men of possessory charges for the firearms that Beaty claims they had that night. However, Beaty's testimony was contradicted not only by Beaty's prior inconsistent statements, but by the testimony of multiple other witness to this case.

*Id.*, at 44.

It is well-settled law a defendant must raise a claim asserting the verdict is against the weight of the evidence before the trial court, either orally at sentencing or in a written post-sentence motion. *See* Pa.R.Crim.P. 607. "The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." *Id.*, *Comment*.

Here, Lynch did file a post-sentence motion, but identified the following weight claim:

The verdict was against the weight of the evidence as multiple witnesses who were on scene described the shooters as being a black male and blond female; the evidence adduced by the Commonwealth was at best confusing and inconsistent; and the Reedman Toll car evidence – which was stipulated to by the

> Commonwealth[8] – showed conclusively that Mr. Lynch's vehicle could not have been the vehicle used the night of the murder due to the mileage recorded by Reedman Toll a few hours before and a few hours after the homicide.

Post-Sentence Motion for a New Trial and/or in arrest of judgment, 10/17/2019, at 4.

In comparing the two arguments, the issue identified in Lynch's post-sentence motion is not the same as the one he now seeks to raise on appeal. As such, he has improperly raised a new theory of relief. He did not provide the court with the opportunity to review this new theory and weigh the evidence. Therefore, his weight of the evidence claim based upon this theory is waived, and we need not address it further.[9]

Lastly, Lynch challenges the discretionary aspects of his sentence. Challenges to the discretionary aspects of sentencing do not guarantee a petitioner's right to our review. *See Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa. Super. 2011).

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

---

[8] *See* Trial Court Opinion, 10/23/2020, at 31 (explaining the Reedman Toll car evidence).

[9] We acknowledge that Lynch did raise evidentiary and sufficiency challenges regarding Beaty's testimony in his post-sentence motion. However, those arguments and corresponding standards of review are significantly different from a weight claim. Moreover, Lynch did raise the weight claim he now wishes to pursue in his Pa.R.A.P. 1925(b) concise statement and the trial court addressed the argument in its Rule1925(a) opinion. Nevertheless, his issue is still deemed waived. *See Commonwealth v. Sherwood*, 982 A.2d 483 (Pa. 2009).

(1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Swope*, 123 A.3d 333, 337 (Pa. Super. 2015) (citation omitted).

Here, Lynch filed a timely notice of appeal, and his brief included a statement of reasons relied upon for allowance of appeal, as is required by Pa.R.A.P. 2119(f). *See* Appellant's Brief, at 22. He also preserved the issue in a post-sentence motion. *See* Post Sentence Motion for a New Trial and/or in Arrest of Judgment, 10/17/2019, at ¶ 7. Therefore, we must determine whether Lynch has raised a substantial question.

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Id.* (internal citations omitted). Generally, "excessiveness claims premised on imposition of consecutive sentences do not raise a substantial question for our review." *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018). Nevertheless, a claim that the sentence was based on an

improper factor raises a substantial question. **See Commonwealth v. Downing**, 2010 PA Super 23, 990 A.2d 788, 792 (Pa. Super. 2010). Likewise, an allegation that the sentence was unreasonable because it was outside the sentencing guidelines raises a substantial question. **See Commonwealth v. Lawrence**, 960 A.2d 473, 478 (Pa. Super. 2008).

Here, Lynch complains that his consecutive sentences were excessive and unreasonable "in light of the jury's specific findings that [the Commonwealth] failed to prove the felonies with which [he] was charged." Appellant's Brief, at 57. He points out that he was not convicted of murder or carrying an illegal weapon, and the jury did not find that he instigated the events that led to the victim's death. **See id.**, at 54. Moreover, he asserts that at sentencing, the Commonwealth improperly described his actions on the night of the shooting as murder and that he provided the firearms. **See id.**, at 55. He states that while that may have been the Commonwealth's view of the case, the jury acquitted him of the homicide, conspiracy, and firearms charges. **See id.**, at 56. Additionally, Lynch states the trial court incorrectly referenced the use of firearms at the sentencing hearing since he was found not to have been in possession of a firearm or to have intentionally used a weapon. **See id.**, at 57. As such, we conclude Lynch has raised a substantial question, and we proceed to examine the merits of his sentencing challenge.

We have a deferential standard of review for discretionary aspects of the sentence claims:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006).

While the court is required to consider the ranges set forth in the sentencing guidelines, it is not bound by them. *See Commonwealth v. Yuhasz*, 923 A.2d 1111, 1118 (Pa. 2007). The court may depart from the "guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community[.]" *Commonwealth v. Eby*, 784 A.2d 204, 206 (Pa. Super. 2001) (citation omitted); *see also* 42 Pa.C.S.A. § 9721(b).

If the court imposes a sentence outside the guideline ranges, it must place adequate reasons for the deviation in the record. *See Commonwealth v. P.L.S.*, 894 A.2d 120, 129-130 (Pa. Super. 2006). Nevertheless, we only vacate an outside-the-guidelines sentence if the "sentence is unreasonable[.]" 42 Pa.C.S.A. § 9781(c)(3).

In making this "unreasonableness" inquiry, we consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

- 24 -

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).

Here, the court had the benefit of a presentence investigation report ("PSI").[10] ***See*** N.T., 10/11/2019, at 56. The court heard impact statements from the victim's parents and argument from both parties.[11] ***See*** N.T., 10/11/2019, at 12-28, 39-56. The court also received a written impact statement from Colter's youngest brother as well as a report from Dr. Steven Samuel. ***See id.***, at 28, 37. Lynch declined his right to allocution, and he was colloquied as to that decision. ***See id.***, at 38-39.

The statutory maximum for the involuntary manslaughter offense is five years. ***See*** 18 Pa.C.S.A. § 2504(b); 18 Pa.C.S.A. § 1104(1). Lynch had a prior record score of two. ***See*** N.T., 10/11/2019, at 36 The offense gravity score ("OGS") for the manslaughter offense was a six. ***See id.*** The Pennsylvania Sentencing Guidelines provide a standard minimum sentencing range of nine

---

[10] The PSI indicated that Lynch's risk to reoffend was "high," and although he did "not have a substantial number of prior arrests, all of the crimes he has been arrested for have involved violence." Trial Court Opinion, 11/6/2020, at 40 n.12 (record citation and quotation marks omitted).

[11] Notably, the Commonwealth argued "that members of the community will look to the court's sentence and weigh what his or her risk would be if they tried to commit a similar offense." ***Id.***; ***see also***, N.T., 10/11/2019, at 49-50.

to sixteen months, with an aggravated range of an additional six months for the conviction. *See id.*, at 37.

Likewise, the statutory maximum for REAP is two years. *See* 18 Pa.C.S.A. § 2702; 18 Pa.C.S.A. § 1104. The OGS was a three. *See* N.T., 10/11/2019, at 37. The Sentencing Guidelines provide a standard range of restorative sanctions to nine months, with an aggravated range of an additional three months. *See id.* As noted above, the court imposed a sentence of two and a half to five years' incarceration for the involuntary manslaughter conviction, followed by two consecutive terms of one to two years for two of the REAP offenses. *See id.*, at 103-104. Accordingly, the court imposed a sentence that exceeded the aggravated range, but not beyond the maximum sentence permitted by law.

At the hearing, the court explained its rationale for imposing such a sentence, acknowledging that Lynch was 27 years old at the time of the shooting. *See* N.T. 10/11/2019, at 56. The court further stated it considered his background, including that while he had difficult childhood, he also had some significant accomplishments. *Id.* The court pointed out that he had a prior criminal history, which included convictions for simple assault and a firearms offense, and he was on federal supervision at the time he committed the present offense. *See id.*, at 52, 57. Likewise, the court noted that his criminal history involves violent conduct. *Id.* The court further explained its rationale as follows:

I do consider the nature of the offense. I consider the fact that this is -- I can't conceive a conduct that would be more reckless than the conduct involved here. What caused the death of Mr. Colter was the use of a firearm, and a firearm is specifically designed to hurt or kill people. This is not the use of an automobile or some other mechanism. I will say specifically that deterrence here is not something I consider because I don't think I reach it.

I wish that a sentence I can impose would deter people in the community from engaging in this kind of conduct. If that were the case it would long have stopped in the community because of other cases in which people have served lengthy sentences. I must consider the protection of the public, and because of [Lynch]'s history of antisocial behavior and his involvement in this most egregious offense, I do have concerns of the protection of the public.

I must also consider the rehabilitative needs of [Lynch]. I think, given his history, the nature of the offenses that he's committed that I properly consider. Anything less than a lengthy sentence would not address his rehabilitative needs, nor would it ensure the protection of the community.

This is -- I'm to consider the gravity of the offense in terms of the effect on the victim and the community. This, of course, there is nothing that causes -- has more of an impact on the community than an act of violence in which persons are placed in danger of death or serious bodily injury and, indeed, a human being is killed.

I note that I do not consider the conduct of [Lynch's mother]. I don't think that's a proper fact for me to consider in imposing [the] sentence.

*Id.*, at 57-59.

Lynch's argument does not warrant any relief. First, it merits mentioning that the judge at Lynch's sentencing was the same judge that oversaw his trial. The judge was fully aware of the facts of the case and the jury's verdict, including the exact crimes for which Lynch was convicted. Moreover, at the

- 27 -

sentencing hearing, when the Commonwealth mentioned that Colter was murdered, defense counsel objected to the use of the word and pointed out that the jury did not find Lynch murdered Colter. *See id.*, at 50. The Court stated it was "well aware" of that fact. *Id.* Furthermore, it is clearly evident from the court's lengthy explanation that the sentence imposed was not based upon the fact that the Commonwealth mentioned the word, murder, or referred to crimes for which Lynch was acquitted.

Second, to extent that Lynch alleges the court incorrectly referenced the use of firearms at the sentencing hearing, the record clearly demonstrates Lynch's counsel conceded to this fact. It was uncontested at trial that Colter died as a result of a gunshot wound to his head. *See* N.T., 4/23/2019, at 63. The jury found Lynch guilty of involuntary manslaughter for his death. The use of the firearm was then addressed by the court at sentencing:

> [The Court]: So can we all agreed that the jury concluded that he participated in the reckless --
>
> [Defense counsel]: Yes, yes.
>
> [The Court]: -- conduct, yes, with the use of firearms?
>
> [Defense counsel]: Yes.
>
> [The Court]: That caused the death of the victim?
>
> [Defense counsel]: Absolutely.
>
> [The Court]: That's where we start.

N.T., 10/11/2019, at 56.

The record reflects that defense counsel agreed that Lynch's involuntary manslaughter conviction involved the use of a firearm, and he cannot now claim the court erred in referring to that fact at sentencing.

Lastly, we observe the court detailed substantial reasons for Lynch's sentence in satisfaction of Sections 9721(b) and 9781(d). Particularly, the record makes clear the court considered Lynch's background and rehabilitative needs, the gravity of the offense as it related to the victim and the community, and the protection of the public. **See** N.T., 10/11/2019, at 57-59. Moreover, the court rejected the Commonwealth's argument concerning deterrence. Therefore, we conclude the trial court did not abuse its discretion in imposing Lynch's sentence, and that his challenge to the discretionary aspects of his sentence is without merit.

Judgment of sentence affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 11/8/2021*