J-S42021-23

2024 PA Super 104

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICARDO DURAN RIVERA | : | |
| | : | |
| Appellant | : | No. 296 EDA 2023 |

Appeal from the Judgment of Sentence Entered August 5, 2022
In the Court of Common Pleas of Chester County
Criminal Division at No:  CP-15-CR-0002267-2018

BEFORE:  BOWES, J., STABILE, J., and DUBOW, J.

OPINION BY STABILE, J.:                    **FILED MAY 22, 2024**

Appellant, Ricardo Duran Rivera, appeals from his judgment of sentence of life imprisonment for second degree murder entered in the Court of Common Pleas of Chester County.  We affirm.

Appellant shot and killed David Doyle III during a home invasion on September 24, 2017.  The record reflects that Appellant and another intruder conspired with Anaye Raggazino to rob the decedent of drugs and money.  The victim's father, David Doyle Jr., witnessed the robbery and the shooting.

Several days after the murder, on September 28, 2017, the Commonwealth filed an application under the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), 18 Pa.C.S.A. §§ 5701-5782, to obtain subscriber information, call and text records, and cell tower information for

the phone number XXX-XXX-9559 for the period of September 23-28, 2017.[1] The application asserted that an affidavit appended to the application, prepared by a Chester County detective, "provides specific and articulable facts showing that there are reasonable grounds to believe that the above requested information associated with phone number XXX-XXX-9559 (MetroPCS/T-Mobile) are relevant and material to an ongoing criminal investigation." Order Denying Appellant's Motion To Suppress ("Order"), 4/4/22, at n.2. The court, per the Honorable Charles Smith, granted the application. The police obtained this historical CSLI to track the movement of Appellant and his cohorts leading up to the home invasion.

In April 2018, Appellant was arrested and charged with second degree murder, conspiracy to commit second degree murder and related offenses.

Several years later, on October 22, 2021, the Commonwealth filed a second application requesting the same historical CSLI for the same period (September 23-28, 2017) that it had made in 2017. The Commonwealth asserted that its reason for making this second application was to ensure that it obtained the historical CSLI in compliance with a decision by the United States Supreme Court handed down after the first application, **Carpenter v. United States**, 585 U.S. 296, 138 S.Ct. 2206 (2018). The second application was virtually the same as the first application except for one difference—while

---

[1] The relevant decisions refer to this type of information as "historical cell site location information" or "historical CSLI." **See**, **e.g.**, **Commonwealth v. Pacheco**, 263 A.3d 626, 635 (Pa. 2021). Accordingly, we will refer to the cell phone records in question as "historical CSLI."

the first application asserted that there were "reasonable grounds" for issuance of the order, the second application asserted that there was "probable cause" for issuance of the order. Order at n.2. The court, per the Honorable Emanuel Bertin, granted the application.

Appellant filed a pretrial motion to suppress the historical CSLI. On April 4, 2022, the suppression court, per the Honorable David Bortner, denied Appellant's motion to suppress. Order at n.2.

Prior to trial, the victim's father, David Doyle Jr., indicated that the individuals who broke into his apartment were wearing masks. As a result, Doyle was never provided with any photo array or lineup to identify the perpetrators. During trial, however, Doyle testified as follows on direct examination:

Q: Did you see anything when you got to the hallway?

A: Yeah.

Q: What did you see?

A: I seen that guy right there. I'll never forget his eyes.

N.T., 4/19/22, at 19. "That guy right there" referred to Appellant. This testimony was the first time after the murder that Doyle identified Appellant as the murderer.

Defense counsel immediately objected to Doyle's testimony on the ground that counsel had never received any discovery indicating that Doyle had been shown a picture of Appellant or had identified Appellant in a photo array or lineup. The prosecutor responded that he had not expected Doyle to

make an in-court identification, and that Doyle had never been shown photographs of Appellant or a lineup. The court overruled defense counsel's objection. *Id.* at 19-21.

On cross-examination, Doyle testified that he had not seen Appellant between the robbery and the time of trial, four and a half years later. Doyle admitted looking at Appellant's picture on the Internet all the time and wanted Appellant to spend the rest of his life in jail. *Id.* at 40-41. Doyle further admitted that the perpetrator was wearing a mask. On redirect, the prosecutor asked whether Doyle's and the perpetrator's eyes met during the incident, and Doyle replied, "Yes." The prosecutor asked whether Doyle would ever forget those eyes, and Doyle replied, "No." The prosecutor asked whether Doyle saw those eyes in the courtroom, and Doyle said "Hell, yeah," identifying Appellant. *Id.* at 43-44.

Defense counsel raised another objection to Doyle's testimony. The court instructed the jury that it was "not going to permit the record to reflect an in-court identification of [Appellant] by this witness." *Id.* at 46. Defense counsel made a motion for mistrial, which the court denied.

Appellant was implicated and identified in court, without objection, by several witnesses other than Doyle as being one of the men involved in these crimes. Daniel Felix testified that he saw Appellant on the night of the murder and that Appellant confessed to murdering someone and showed Felix the gun used to commit the crime. N.T., 4/18/22, at 208-10. Franklin Watson testified that Appellant described the events of the robbery and murder to him. N.T.,

4/20/22, at 172-80. Keisha Ramos testified that she overheard Appellant stating that he disposed of the clothes, shoes and weapon used during the incident. N.T., 4/21/22, at 95, 99-100. All these witnesses, like Doyle, identified Appellant in the court as sitting at the defendant's table in a blue suit.

The court gave the jury a detailed instruction on the factors that they should consider when weighing the credibility of Doyle's identification testimony.

On April 22, 2022, the jury found Appellant guilty of second-degree murder. Judge Bortner sentenced Appellant to the statutory sentence of life imprisonment without possibility of parole. Appellant filed timely post-sentence motions, which the court denied, and a timely appeal to this Court. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal, which we have reordered for purposes of convenience:

> 1. Whether the trial court erred in admitting cellular telephone communication records and cell tower records, when the search and seizure of the cellular telephone/ cell tower records was conducted without a search warrant and the subsequently issued search warrant failed to state probable cause?
>
> 2. Whether the trial court erred in permitting David Doyle, Jr. to improperly identify Appellant at trial by testifying, "I seen that guy right there. I'll never forget his eyes?"
>
> 3. Whether the trial court erred in denying Appellant's motion for mistrial after David Doyle, Jr. improperly identified Appellant at trial which resulted in substantial prejudice and deprived Appellant of a fair trial?

4. Whether the trial court erred in denying Appellant's post-sentence motion for a new trial after David Doyle, Jr. improperly identified Appellant at trial which resulted in substantial prejudice and deprived Appellant of a fair trial?

Appellant's Brief at 10 (cleaned up).

Relying on *Carpenter*, Appellant first argues that the trial court erred in denying his motion to suppress, because Judge Smith's order authorizing disclosure of historical CSLI in 2017 was not supported by probable cause. The fact that the police obtained a search warrant for the same records in 2021, Appellant continued, did not cure the defect in the 2017 order. We hold that the trial court properly denied Appellant's motion to suppress, because, *inter alia*, both the 2017 and 2021 orders satisfied the requisites for a search warrant articulated in *Commonwealth v. Pacheco*, 263 A.3d 626 (Pa. 2021).

Our standard of review of a trial court's ruling on a suppression motion is "whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Rosario*, 248 A.3d 599, 607 (Pa. Super. 2021). We are bound by the facts found by the trial court so long as they are supported by the record, but we review its legal conclusions *de novo*. *Id.* at 607-08. The trial court has sole authority to pass on the credibility of witnesses and the weight to be given to their testimony. *Id.* at 608. "Our scope of review is limited to the record developed at the suppression hearing, considering the evidence presented by the Commonwealth as the prevailing party and any uncontradicted evidence

presented by the defendant." ***Commonwealth v. Kane***, 210 A.3d 324, 329 (Pa. Super. 2019).

The Fourth Amendment of the United States Constitution "protects citizens from unreasonable searches and seizures." ***Commonwealth v. Barnes***, 296 A.3d 52, 56 (Pa. Super. 2023). "[S]earch warrants may only issue upon probable cause." ***Pacheco***, 243 A.3d at 645. Here, the police obtained the September 2017 order for historical CSLI pursuant to Section 5743 of Pennsylvania's Wiretap Act. Section 5743 authorizes an investigative or law enforcement officer to "require the disclosure by a provider of communication service of the contents of a communication which is in electronic storage in a communication system." 18 Pa.C.S.A. § 5743(a). A provider of electronic communication services is permitted to disclose "a record or other information pertaining to a subscriber to or customer of service," other than contents of communications, to the officer when he uses one of several means, including a court order. 18 Pa.C.S.A. § 5743(c)(2). To obtain a court order, the officer must demonstrate "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 Pa.C.S.A. § 5743(d).

In 2018, subsequent to the first order in this case for historical CSLI, the United States Supreme Court decided ***Carpenter***, a case which concerned "how to apply the Fourth Amendment to a new phenomenon: the ability to

chronicle a person's past movements through the record of his cell phone signals. . .[because m]uch like GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled." ***Carpenter***, 585 U.S. at 309.[2] In ***Carpenter***, federal prosecutors applied for court orders

_____

[2] The ***Carpenter*** Court described how a cell phone's movement is tracked as follows:

> Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites." Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings. Cell sites typically have several directional antennas that divide the covered area into sectors.

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as [CSLI]. The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

> Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine

*(Footnote Continued Next Page)*

under the Stored Communications Act, 18 U.S.C. § 2703, to obtain cell phone records for the defendant and several other suspects. Similar to Section 5743 of Pennsylvania's Wiretap Act, the Stored Communications Act "permit[ed] the Government to compel the disclosure of certain telecommunications records when it offers specific and articulable facts showing that there are reasonable grounds to believe" that the records sought were "relevant and material to an ongoing criminal investigation." *Id.* at 302. The Court held, for the first time, that law enforcement officials violated an individual defendant's Fourth Amendment rights by obtaining his historical CSLI from a third-party carrier without first obtaining a search warrant supported by probable cause. *Id.* at 310. The Court also made clear that the "reasonable grounds" standard "[fell] well short of the probable cause required for a warrant." *Id.* at 317.

In *Pacheco*, our Supreme Court applied *Carpenter* to Pennsylvania's Wiretap Act. The police in *Pacheco* were conducting a heroin-trafficking investigation and obtained several orders pursuant to the Wiretap Act to secure real-time CSLI tracking. *Pacheco* held that Appellant had a legitimate expectation of privacy in his real-time CSLI, so "*Carpenter's* rationale

---

data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter*, 585 U.S. at 300-01.

requiring a warrant pursuant to the Fourth Amendment for the collection of historical CSLI equally applies here." ***Pachecho***, 263 A.3d at 641.

> ***Pacheco*** reasoned that
>
> the United States Supreme Court has not required that the issuing authority label its determination of probable cause a "warrant." In fact, in [***Dalia v. United States***, 441 U.S. 238 (1979)], the Court upheld a court order authorizing the interception of an oral communication on grounds that it substantively complied with the 4th Amendment's warrant requirement. [***Id.***] at 256 (stating that the "[t]he April 5 court order authorizing the interception of oral communications occurring within petitioner's office was a warrant issued in full compliance with these traditional Fourth Amendment requirements").
>
> Likewise, . . . this Court has held that orders issued pursuant to [Pennsylvania's] Wiretap Act may serve as the functional equivalent of a warrant for constitutional purposes where the protections of the Fourth Amendment were afforded. ***See*** [***Commonwealth v. Brion***, 652 A.2d 287, 289 (Pa. 1994)] (holding that the probable cause/warrant requirement to obtain an oral communication under the Wiretap Act could be satisfied by a prior determination of probable cause rendered by a neutral, judicial authority); and [***Commonwealth v. Melilli***, 555 A.2d 1254, 1258-59 (Pa. 1989)] (holding that "a judicial order authorizing the installation of pen registers [under the Wiretap Act] is the equivalent of a search warrant in its operative effect . . . [and] the affidavit and order must comply with the requirements of probable cause"). Thus, it is clear that **the substance, not the label, determines whether a particular court order constitutes a valid warrant**.

***Id.*** at 646 (emphasis added).

> ***Pacheco*** also observed:
>
> In summarizing the plain language of the Fourth Amendment, the United States Supreme Court has explained that there are three prerequisites for a valid warrant: (1) the warrant must be issued by a neutral, disinterested magistrate; (2) the entity seeking the warrant must demonstrate probable cause to believe that the evidence sought will aid in a particular apprehension or conviction

for a particular offense; and (3) the warrant must describe particularly the place to be searched and the items to be seized.

*Id.* (citing *Dalia*, 441 U.S. at 255). Applying these standards, *Pacheco* held that the substance of the orders authorizing seizure of real-time CSLI, and the affidavit of probable cause underlying the orders submitted by a police detective, satisfied the three requisites for a valid warrant. *Id.* at 647-52.

In the present case, the suppression court, per Judge Bortner, held that **both** the 2017 and 2021 applications for historical CSLI fulfilled the three requirements for a valid warrant set forth in *Pacheco*. We agree.

First, the suppression court correctly observed that "both the 2017 and 2021 orders were issued by a neutral, disinterested magistrate. There is no evidence in this record that Judge Smith or Judge Bertin were anything but impartial in their consideration of the Commonwealth's requests." Order, 4/4/22, at n.2 (cleaned up).

Next, the suppression court correctly concluded that the 2017 and 2021 applications provided probable cause to obtain the historical CSLI. "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018). In considering an affidavit of probable cause, the issuing authority

> Must apply the totality of the circumstances test which requires [it] to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit . . . including the

- 11 -

veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

***Commonwealth v. Johnson***, 42 A.3d 1017, 1031 (Pa. 2012). Courts should not invalidate warrants by interpreting them in a hyper-technical fashion. ***Illinois v. Gates***, 462 U.S. 213, 236 (1983). A court reviewing the issuing authority's determination of probable cause examines only whether a substantial basis existed for the issuing authority's finding of probable cause. ***Johnson***, 42 A.3d at 1031. An "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review," ***Gates***, 462 U.S. at 236, because the issuing authority's probable cause determination is entitled to deference.

Here, the suppression court reasoned:

[T]he affidavit first prepared in 2017, and utilized again in 2021, provides probable cause that the requested information would aid in the apprehension or conviction of the individuals responsible for the September 24, 2017 homicide of David Doyle III. According to police, the incident began when an individual named Anaye Raggazino entered the victim's residence at 782 Worth Boulevard, Apartment 206, North Coventry Township, Chester County. Almost immediately after Ms. Raggazino entered the apartment, she was joined by two masked individuals, one of whom was brandishing a handgun. During the course of this home invasion, the victim was fatally shot, and both the masked individuals and Ms. Raggazino fled the scene after the shots were fired. During the investigation, police interviewed the victim's father, David Doyle, Jr., and his fiancée Tiffany Poznanski. Both of those witnesses confirmed that Anaye Raggazino had arrived at the victim's residence minutes prior to the home invasion and homicide.

Pertinent to this case, Ms. Raggazino arrived at the residence of an unnamed witness after the homicide. This witness told police

that Raggazino admitted that she had been involved in the robbery of an individual named "David," and that the robbery had not gone the way she had intended. She described the above-referenced events in detail to the witness, and informed the witness that her cousin Bianca had been involved in the planning of the robbery. At approximately 2:00 a.m. on September 25, 2017, Ms. Raggazino used the witness's cellphone to dial XXX-XXX-9559, the telephone number at issue herein. She told the witness that this phone number belonged to her cousin Bianca. Ms. Raggazino's aunt, Dawn Stutzman, related to police that Raggazino told her that she intended to rob David Doyle, Jr. for drugs and money, and that she had been present at the scene of the shooting. Stutzman also confirmed that her daughter-in-law is Bianca Rowan.

These averments in the affidavit provide probable cause that inspection of the telephone records and cell tower data of XXX-XXX-9559 would provide information aiding in the arrest or conviction of the perpetrators of the homicide. We note that at the time they made their request, police believed that this number belonged to Bianca Rowan. However, at the hearing on February 3, 2022, the Commonwealth set forth that their investigation determined that Ms. Rowan was not involved in this incident and the phone number was actually associated with [Appellant]. The ultimate identity of the individual who used the number is of no moment in determining whether probable cause arose from this affidavit - we must consider what information was available to the magistrate when considering whether to grant the Commonwealth's request.

The affidavit describes in detail the events of the home invasion that led to the homicide, as well as every significant step taken by police in their investigation. Ms. Raggazino allegedly admitted to multiple parties that she was present at, and participated in, the robbery scheme and the shooting. She told the unnamed witness that her cousin Bianca was involved as well, and used that witness's cellphone to allegedly call Bianca at XXX-XXX-9559. Accordingly, the activity of that phone number was likely to generate information relating to the incident. [Appellant] argues that the only individual who actually connected this phone number to the homicide is an unnamed witness, and therefore not reliable enough to generate probable cause. However, the affidavit indicates that the witness was interviewed on September 27, 2017 by Detectives Robert Balchunis and Ben Martin. Even though the

- 13 -

witness was unnamed in the affidavit itself, the fact that [the witness was] actually interviewed by police indicates [the witness's] identity was and continues to be known to law enforcement. This witness is therefore no more or less reliable than any other, and is distinguishable from an anonymous, and therefore inherently unreliable, source. We therefore conclude that probable cause was present in both affidavits, as required by **Pacheco**.

Order at n.2 (cleaned up).

We disagree with Appellant's contention that "the averments contained in both affidavits did not amount to probable cause. The averments amounted to suspicion and nothing more." Appellant's Brief at 29. The affidavit rested in part on an interview with an anonymous informant, who stated that one of the participants in the fateful home invasion, Raggazino, told the informant that her cousin Bianca Rowan had also participated in the home invasion and used the informant's phone to contact Bianca at the number that was the subject of the wiretap application (XXX-XXX-9559). The police corroborated the informant's tip by interviewing eyewitnesses to the murder who identified Raggazino as one of the perpetrators of the home invasion.

The police further corroborated the informant's tip by interviewing Raggazino's aunt, who stated that Raggazino told her that she (Raggazino) intended to rob the victim's father, David Doyle, Jr., for drugs and money, and that she was present during the shooting. In addition, Raggazino's aunt confirmed that her daughter-in-law is Bianca Rowan, another suspect in the home invasion. This information, combined with the anonymous tip, gave rise to probable cause for the issuance of the 2017 wiretap order. **See**

***Commonwealth v. Sanchez***, 589 Pa. 43, 907 A.2d 477, 488 (2006) ("information received from an informant whose reliability is not established may be sufficient to create probable cause where there is some independent corroboration by police of the informant's information").

Finally, the suppression correctly concluded, based on the following analysis, that the 2017 and 2021 applications "describe particularly the place to be searched and the items to be seized." Order at n.2. The court reasoned:

> Even though the "place to be searched" was not a geographical location, and the "items to be seized" were electronic data as opposed to physical objects, the information being requested by the Commonwealth for the number XXX-XXX-9559 is provided in detail:
>
> 1. Current subscriber information, to include subscriber name, user name, address, additional contact number, date service began and date service was terminated (if applicable);
>
> 2. Call detail records to include originating telephone number, dialed telephone number, date and time call originated, date and time call terminated, duration of call;
>
> 3. SMS and MMS detail records to include originating telephone number, receiving telephone number, date and time message was sent;
>
> 4. Cell tower information for all calls to include, originating cell tower site and sector, terminating cell tower site and sector and all cell tower site locations.
>
> (Commonwealth's Exhibit C-3, Bates stamp p. 001122; Commonwealth's Exhibit C-4, Bates stamp p. 002237). Apart from the affidavit, the applications themselves also limit this request to only that data generated from that telephone number between September 23 and September 28, 2017. This request is sufficiently specific to comply with the Fourth Amendment requirements set forth in ***Pacheco***.

***Id.*** We agree that both applications described the items to be searched with reasonable particularity.

Appellant argues that the 2017 application was invalid because the issuing authority, Judge Smith, applied the "reasonable grounds" standard prescribed under 18 Pa.C.S.A. § 5743 instead of the correct standard of probable cause. Appellant further asserts that the 2021 application did not cure the defect in the 2017 application process, even though Judge Bertin applied the probable cause standard when he granted the 2021 application. Finally, Appellant suggests that since Judge Smith applied the reasonable grounds test at the time of the 2017 application, Judge Bortner could not apply the probable cause standard to the 2017 application during pretrial suppression proceedings.

We begin our analysis of this argument by noting that neither ***Carpenter*** nor ***Pacheco*** examine this question because the circumstances in those cases were different from the present case. In ***Carpenter***, both the magistrate who issued the wiretap order and the judge who denied suppression applied the standard of reasonable grounds. ***Id.***, 585 U.S. at 302, 317. In ***Pacheco***, both the judge who issued the wiretap application and

the judge who denied suppression applied the standard of probable cause.[3]
*Id.*, 243 A.3d at 648.

There are, however, two pertinent decisions on this subject from this Court: ***Commonwealth v. Lynch***, 268 A.3d 411, 2021 WL 5176390 (Pa. Super., Nov. 8, 2021) (unpublished memorandum), and ***Commonwealth v. Davis***, 241 A.3d 1160, 1172-73 (Pa. Super. 2020). In ***Lynch***, in 2016, prior to ***Carpenter***, the court granted a wiretap order to obtain historical CSLI relating to Appellant's cell phone by finding that the wiretap application provided reasonable grounds for issuance of the order. In 2018, due to the change in the law in ***Carpenter***, the police obtained another warrant for the same cell phone based on a showing of probable cause. No new records were obtained from this warrant. The trial court denied the defendant's motion to suppress the historical CSLI seized under the 2016 order on the ground that the application for the 2016 order satisfied the probable cause standard. In other words, the court applied the probable cause test to the 2016 application

_____

[3] The prosecutors in ***Pacheco*** applied for a wiretap under 18 Pa.C.S.A. § 5773, a different statute under Pennsylvania's Wiretap Act than the statute under which the Commonwealth sought a wiretap in the present case, 18 Pa.C.S.A. § 5743. Section 5773 requires a showing of probable cause to "authoriz[e] the disclosure of mobile communications tracking information, the installation and use of a pen register, a trap and trace device or a telecommunication identification interception device within this Commonwealth." 18 Pa.C.S.A. § 5773(a).

at the suppression stage even though the court had only applied the reasonable grounds test at the time it issued the wiretap order.

This Court affirmed, reasoning that the 2016 application satisfied ***Dalia's*** three requisites, including its requirement of probable cause. We consider ***Lynch*** persuasive authority for the determination that Judge Smith's use of the "reasonable grounds" standard in granting the wiretap application in 2017 did not preclude Judge Bortner from applying the probable cause test to the same application at the pretrial suppression stage in 2022. ***See*** Pa.R.A.P. 126 (non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for their persuasive value). Appellant fails to present any authority, nor are we aware of any, that use of the reasonable grounds standard by the judge who grants a wiretap application precludes another judge from applying a different, correct standard to the same application following a change in the law.

Even if the initial seizure of the historical CSLI evidence in 2017 was unlawful under ***Carpenter***, the second seizure of the same evidence in 2021 was proper under the doctrine of inevitable discovery. In ***Davis***, a case with similar facts to the present case, the police obtained a wiretap order for historical CSLI in 2016 based on a showing of reasonable grounds. Following ***Carpenter***, the police obtained a search warrant using virtually the same affidavit as it used in the 2016 application. The trial court denied the defendant's motion to suppress. In this Court, the defendant argued that

suppression was necessary because the reasonable grounds standard was erroneous, and the fact that the police subsequently obtained a warrant did not purge the taint of the original wiretap order.

This Court observed that the inevitable discovery doctrine provides that "if the prosecution can establish by a preponderance of the evidence that illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible." **Davis**, 241 A.3d at 1172. "This standard requires a finding that the law enforcement officer's decision to seek a warrant was prompted by information independent of what was learned during the unlawful search and the information illegally obtained did not influence the issuing authority's decision to issue the search warrant." **Id.**

Based on this doctrine, we held that suppression was unnecessary because (1) the police first obtained historical CSLI in 2016 under Section 5743 because that statute was the governing law at that time, and the police did not engage in any cognizable misconduct by following it; (2) after the Supreme Court issued **Carpenter**, the police secured the same records with a search warrant based on a showing of probable cause; and (3) in the affidavit of probable cause attached to the search warrant, the police did not use the CSLI records obtained from the 2016 order. **Id.** at 1172-73. Thus, "the evidence was sufficiently purged of any original illegality to allow its admission under the inevitable discovery doctrine." **Id.**; **see also Lynch**,

2021 WL 5176390, at *8 (following **Davis** and holding, under circumstances similar to **Davis**, that even if initial order approving wiretap was erroneous due to application of "reasonable grounds" test, trial court properly denied motion to suppress historical CSLI under inevitable discovery doctrine).

Presently, even if Judge Bertin's 2017 order was erroneous, the seizure of the historical CSLI in 2021 was permissible under the doctrine of inevitable discovery for the same reasons given in **Davis**: (1) the police first obtained historical CSLI in 2017 under Section 5743 because that statute was the governing law at that time, and the police did not engage in any cognizable misconduct by following it; (2) after the Supreme Court issued **Carpenter**, the police secured the same records with a search warrant based on a showing of probable cause; and (3) in the affidavit of probable cause attached to the search warrant, the police did not use the CSLI records obtained from the 2017 order.

For these reasons, we hold that Judge Bortner properly denied Appellant's motion to suppress the historical CSLI. It is the substance of the 2017 and 2021 applications that determine whether they constitute valid warrants, not their title. Although the 2017 application was labeled as an application for a wiretap under Section 5743, its substance met the three requisites for a valid warrant under **Dalia**. The 2021 application, titled as an application for a search warrant, fulfilled the same requirements. The fact that Judge Bertin examined the 2017 application under the "reasonable

grounds" standard within Section 5743 did not prevent Judge Bortner from evaluating the same application under the more exacting probable cause standard during pretrial suppression proceedings—and in any event, the inevitable discovery doctrine justified the seizure of this evidence.

Appellant's next three arguments, which we will consider together, concern the in-court identification of Appellant by David Doyle, Jr., the victim's father. Appellant argues that Doyle's in-court identification was inherently unreliable, and that Judge Bortner erred by denying Appellant's motion for mistrial, because (1) Doyle failed to make such an identification at any point between the murder and trial, a period exceeding four years, (2) the identification was inconsistent with Doyle's prior statements to police and those of other witnesses, (3) defense counsel had not received any discovery that indicated Doyle would make an in-court identification, and (4) the dramatic nature of the surprise identification in front of the jury—"I'll never forget his eyes"—was overly suggestive. *See* Appellant's Brief at 17-25.

Our standard of review in assessing the denial of a motion for mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

***Commonwealth v. Rega***, 933 A.2d 997, 1016 (Pa. 2007).

The trial court thoroughly discussed this matter in its order denying

Appellant's post-sentence motions:

> [Appellant] argues that this in-court identification was inherently unreliable due to a number of factors. [Doyle] failed to make such an identification at any point prior to trial, a period of over four years. According to [Appellant], the identification was inconsistent with [Doyle]'s prior statements to police and those of other witnesses. [Appellant] also claims that the courtroom setting of this identification was overly suggestive, given [Appellant]'s location and status a[t] the time of [Doyle]'s testimony. Based upon these allegedly prejudicial circumstances, [Appellant] now moves that his right to a fair trial was infringed by [Doyle]'s identification, and accordingly requests a new trial.

> In support of this claim, [Appellant] brings the court's attention to the cases of ***Commonwealth v. Pifer***, 425 A.2d 757 (Pa. Super. 1981) and ***Commonwealth v. Carter***, 643 A.2d 61 (Pa. 1994). We first note that the holding in ***Carter*** addressed whether an improper pretrial identification may be testified to at trial, and the steps that must be taken to sanitize it. In ***Pifer***, however, the alleged victim of a rape identified the defendant as the perpetrator for the first time at trial. The Superior Court held that, in such a scenario, "a one-on-one identification of a defendant in the context of a judicial proceeding is inherently suggestive, [but] it is concomitantly well-settled that any taint resulting from such a viewing can be negated in certain cases. Specifically, if the prosecution establishes by clear and convincing evidence that the totality of the circumstances affecting the witness' identification did not involve a substantial likelihood of misidentification, then the in-court identification must be deemed reliable." ***Id.*** at 762.

> When defense counsel objected after [Doyle] initially stated that he recognized [Appellant]'s eyes, the court overruled the objection. The court recognized that this testimony was unsolicited and a surprise to all parties, but those circumstances did not, in and of themselves, require the statement to be struck from the jury's consideration. On cross-examination, defense counsel elicited testimony that showed [Doyle]'s substantial and understandable bias in this trial, as well as the fact that [Doyle] repeatedly viewed [Appellant]'s photograph on the internet. This

strategic line of questioning no doubt immediately raised substantial concerns as to the veracity of [Doyle]'s identification. On redirect examination, the district attorney then attempted to have [Doyle] make a formal in-court identification of [Appellant] as the individual who shot his son. The court granted the defense objection prohibiting this explicit and consequential identification, based upon the inherent unreliability of such testimony as set forth in *Pifer*, *supra*. The jury was specifically instructed that the record would not reflect [Doyle]'s in-court identification of [Appellant].

Critically, the court delivered in its closing charge to the jury Pennsylvania Suggested Standard Criminal Jury Instruction 4.07(A) on identification testimony. The jury in this case was specifically instructed as follows:

1. In his testimony, David Doyle, Jr. has identified the defendant as the person who committed the crime.

2. In evaluating his testimony, you should consider the following factors in addition to the other instructions I will have provided to you for judging the testimony of witnesses:

   a. Did the witness have a good opportunity and enough time to observe the perpetrator of the offense?

   b. Was there enough lighting for him to make his observations?

   c. Was he close enough to the individual to note his facial and other physical characteristics, as well as any clothing he was wearing?

   d. Has he made a prior identification of the defendant as the perpetrator of these crimes?

   e. Was his identification positive or was it qualified by any hedging or inconsistencies?

   f. Did the witness identify anyone else as the perpetrator, during the course of this case?

   g. How attentive was the witness during the incident?

- 23 -

h. Was the witness's focus affected by a visible weapon?

i. Was the witness under high levels of stress during the incident? If so, did this affect the witness's ability to give an accurate identification?

j. Was the witness intoxicated at the time of the identification?

k. Did the race of the witness and the perpetrator have any bearing on the accuracy of the identification?

3. Please consider that a victim or another witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that you must receive it with caution.

4. Identification testimony must be received with caution:

a. if the witness did not identify the defendant as the criminal before the trial; or

b. if there are any other factors that could affect the witness's identification of the defendant, including masks.

5. If you believe that one or more of these factors are present, then you must consider with caution David Doyle, Jr.'s testimony identifying the defendant as the person who committed the crime. If, however, you do not believe that at least one of these factors is present, then you need not receive the testimony with caution; you may treat it like any other testimony.

6. You should consider all evidence relevant to the question of who committed the crime, including the testimony of all of the witnesses. You cannot find the defendant guilty unless you are satisfied beyond a reasonable doubt by all the evidence, direct and circumstantial, not only that the crime was committed but that it was the defendant who committed it.

This instruction directly addresses [Appellant]'s concerns with [Doyle]'s identification testimony. The jury was given a series of factors to weigh when considering this testimony. Several of those factors, which may call the identification into question, existed in this case. For example, [Doyle] was purportedly high

on fentanyl at the time of the home invasion that led to the victim's death. Importantly, the jury was specifically instructed that, if they found th[at] certain additional circumstances existed, [Doyle]'s identification was to "so doubtful" that it had to be "received with caution." Those additional circumstances - that [Doyle] did not identify [Appellant] prior to the trial and that the perpetrator was wearing a mask - were directly testified to by [Doyle] and were incontrovertibly present in this case. The court can thus reasonably conclude that the jury did receive [Doyle]'s identification testimony with caution as instructed. Accordingly, the jury was properly instructed as to how to weigh the identification's inherent unreliability when deliberating upon its verdict. Additionally, the court's ruling not to have the record reflect an in-court identification by [Doyle] was intended to provide some degree of minimization of the surprise nature of this testimony. [Appellant]'s rights to a fair trial were therefore protected and he is not entitled to a new trial.

Order, 12/28/22, at n.1. This careful analysis was a proper exercise of discretion. Judge Bortner aptly recognized that the Commonwealth's conduct was blameless because it had no reason to suspect that Doyle would spontaneously identify Appellant from the witness stand. Furthermore, Appellant had the opportunity to cross-examine Doyle, and defense counsel took full advantage of this opportunity by demonstrating Doyle's bias and the fact that Doyle repeatedly viewed Appellant's photograph on the Internet.

Next, the court gave a detailed instruction to the jury listing the factors it had to weigh in evaluating Doyle's testimony. "It is well settled that the jury is presumed to follow the trial court's instructions." *Commonwealth v. Lamont*, 308 A.3d 304, 312 (Pa. Super. 2024). Nothing in the record rebuts this presumption. Finally, we note that the Commonwealth presented substantial evidence of Appellant's guilt unrelated to Doyle's testimony, such

as the historical CSLI described above and testimony of other witnesses that Appellant confessed to the murder. For these reasons, Doyle's in-court identification of Appellant does not entitle him to a new trial.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/22/2024